**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BIG LOTS, INC., et al.[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 24-11967 (JKS)<br><br>(Jointly Administered)<br><br>**Hearing Date:**<br>October 9, 2025 at 10:00 a.m. (ET)<br><br>**Objection Deadline:**<br>October 2, 2025 at 4:00 p.m. (ET) |

**JOINT MOTION OF DEBTORS AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO APPROVE ENTRY INTO SETTLEMENT
AGREEMENT WITH CERTAIN OFFICERS AND DIRECTORS OF
THE DEBTORS PURSUANT TO 11 U.S.C. § 105(a) AND
FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**

Big Lots, Inc. and certain of its affiliates (collectively, the "**Debtors**" or "**Big Lots**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "**Committee**") hereby jointly file this *Joint Motion of Debtors and the Official Committee of Unsecured Creditors to Approve Entry into Settlement Agreement with Certain Officers and Directors of the Debtors Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9019* (this "**Motion**"). This Motion is supported by the *Declaration of Elizabeth LaPuma in Support of Joint Motion of Debtors and the Official Committee of Unsecured*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

*Creditors to Approve Entry into Settlement Agreement with Certain Officers and Directors of the Debtors Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9019*, attached hereto as **Exhibit A** (the "**LaPuma Declaration**"). In further support of the Motion, the Debtors and the Committee respectfully state as follows:

### RELIEF REQUESTED

1. By this Motion, and pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors and Committee jointly request entry of an Order, substantially in the form attached hereto as **Exhibit B** (the "**Proposed Order**"), authorizing the Debtors to enter into and perform under the settlement agreement substantially in the form attached hereto as **Exhibit C** (the "**Settlement Agreement**").

### INTRODUCTION

2. By this Motion, the Debtors and Committee request approval of the proposed Settlement Agreement among (a) fourteen current and former directors and officers of the Debtors (the "**Settling D&Os**"),[2] (b) the Debtors, and (c) the Committee (collectively, the "**Parties**").

3. The Settlement Agreement is the culmination of months of extensive, arm's-length negotiations between the Debtors, the Committee, the Settling D&Os, and Berkshire Hathaway Specialty Insurance, the primary insurer under the Debtors' D&O insurance policies ("**Berkshire**"). At the urging of the Committee, the Debtors successfully negotiated with Gordon Brothers Retail Partners, LLC ("**GBRP**") to carve out both (a) all potential claims and causes of action held by the Debtors' estates against all current and former directors and officers of the

---

[2] The Settling D&Os are Bruce K. Thorn, Cynthia T. Jamison, Sandra Y. Campos, James R. Chambers, Wendy L. Schoppert, Christopher J. McCormick, Sebastian J. DiGrande, Ronald A. Robins, Jr., Michael A. Schlonsky, Marla C. Gottschalk, Kimberley A. Newton, Nancy A. Reardon, Maureen B. Short, and Jonathan E. Ramsden.

Debtors (collectively, the "**Potential D&O Claims**") and (b) the proceeds from any of the Debtors' D&O insurance policies (collectively, the "**D&O Policy Proceeds**" and together with the Potential D&O Claims, the "**D&O Assets**") from the sale of substantially all of their assets to GBRP. The D&O Assets, thus, constitute some of the few non-cash assets remaining in the Debtors' estates. After months of document and other discovery, and after conducting a thorough investigation into the merits of the Potential D&O Claims, the Committee engaged in direct negotiation with the Settling D&Os, resulting in the Settlement Agreement.

4. The benefits of entry into the Settlement Agreement are manifest. The Settlement Agreement entitles the Debtors' estates to an immediate cash payment of $6.5 million from Berkshire that the Debtors intend to promptly use to make a further interim payment to administrative expense creditors in these Chapter 11 Cases. Entry into the Settlement Agreement further allows the Parties to settle the Potential D&O Claims without the need for drawn-out, costly and time-consuming litigation (including any potential litigation regarding whether the Committee would have standing to assert the Potential D&O Claims in the absence of a settlement), a welcome result given the Debtors' limited resources in these Chapter 11 Cases. Moreover, both the Debtors and the Committee have independently concluded that, in light of the uncertainties associated with litigation and after weighing the merits of the Potential D&O Claims, entry into the Settlement Agreement is unquestionably in the best interests of the Debtors' estates and their creditors. The Debtors and Committee file this motion jointly to underscore their united view that a final resolution of the Potential D&O Claims embodied in the Settlement Agreement inures to the benefit of all parties-in-interest.

**JURISDICTION AND VENUE**

5.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding under 28 U.S.C. § 157(b). In addition, each of the Debtors and the Committee confirm their consent, pursuant to rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

6.      Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are section 105(a) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

**BACKGROUND**

**A.      The Chapter 11 Cases**

8.      On September 9, 2024 (the "**Petition Date**"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief. The Debtors remain in possession of their property and continue to manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

9.  The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [D.I. 95] entered by the Court on September 10, 2024, in each of the Chapter 11 Cases.³

10. On September 23, 2024, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Committee pursuant to section 1102 of the Bankruptcy Code. *See Not. of Appointment of Comm. of Unsecured Creditors* [D.I. 248].

11. At a hearing on December 31, 2024, the Debtors received Court approval to consummate a sale (the "**GBRP Sale**") of substantially all of the Debtors' assets to GBRP. On January 2, 2025, the Court entered the *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of all Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances, (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 1556] (the "**GBRP Sale Order**"). The GBRP Sale was subsequently consummated on January 3, 2025. *See Notice of Closing of Sale of Debtors' Assets to Gordon Brothers Retail Partners, LLC* [D.I. 1588].

12. In order to obtain the Committee's support for the GBRP Sale, the Debtors and GBRP agreed to identify the D&O Assets, as "Excluded Assets" not being sold to GBRP. *See*

---

³ *See In re Great Basin, LLC*, No. 24-11966 (JKS); *In re Big Lots, Inc.*, No. 24-11967 (JKS); *In re Big Lots Management, LLC*, No. 24-11969 (JKS); *In re Consolidated Property Holdings, LLC*, No. 24-11968 (JKS); *In re Broyhill LLC*, No. 24-11971 (JKS); *In re Big Lots Stores - PNS, LLC*, No. 24-11970 (JKS); *In re Big Lots Stores, LLC*, No. 24-11973 (JKS); *In re BLBO Tenant, LLC*, No. 24-11972 (JKS); *In re Big Lots Stores - CSR, LLC*, No. 24-11976 (JKS); *In re CSC Distribution LLC*, No. 24-11974 (JKS); *In re Closeout Distribution, LLC*, No. 24-11978 (JKS); *In re Durant DC, LLC*, No. 24-11975 (JKS); *In re AVDC, LLC*, No. 24-11981 (JKS); *In re GAFDC LLC*, No. 24-11977 (JKS); *In re PAFDC LLC*, No. 24-11982 (JKS); *In re WAFDC, LLC*, No. 24-11979 (JKS); *In re INFDC, LLC*, No. 24-11983 (JKS); *In re Big Lots eCommerce LLC*, No. 24-11980 (JKS); *In re Big Lots F&S, LLC*, No. 24-11984 (JKS).

Dec. 30, 2024 Hr'g Tr. at 32:13–24, 43:7–14; GBRP Sale Order, Ex. 1 (the "**GBRP APA**"), at §§ 2.02(h), (m).[4]

### B.     The D&O Assets

13.     Since its appointment on September 23, 2024, and consistent with its statutory mandate, the Committee has been investigating potential estate causes of action against the Debtors' current and former directors and officers.  Prior to the Debtors' proposed sale of substantially all of their assets (including estate causes of action) (the "**Nexus Sale**") to affiliates of Nexus Capital Management, LP ("**Nexus**"), the Committee filed a limited objection to such sale, arguing, among other things, that it was premature for the Debtors to sell estate causes of action because the Committee's investigation was still in its early stages and that the Debtors had not adequately investigated such potential claims for their value.  *See Limited Objection of the Official Committee of Unsecured Creditors to Proposed Sale of Substantially All of the Debtors' Assets* [D.I. 981], ¶¶ 28–35.

14.     In advance of the hearing to approve the Nexus Sale, the Debtors engaged Porter Wright Morris & Arthur LLP ("**Porter Wright**") to conduct an independent investigation into whether any colorable claims for breach of fiduciary duty could be made against the Debtors' current and former directors or executive officers for actions arising prior to the Petition Date. During its investigation, Porter Wright spent more than 400 attorney hours reviewing thousands of pages of the Debtors' documents and conducting interviews of 18 of the Debtors' current and former directors, officers, and advisors.  On November 8, 2024, Porter Wright issued an Independent Investigation Report (the "**Porter Wright Report**") which found, among other

---

[4] *See also* GBRP Sale Order, ¶ 11 ("As set forth in Section 2.02(h) and (m) of the APA, Excluded Proceedings and the proceeds thereof, as well as D&O Insurance Policies, the proceeds thereof, and all rights and benefits of any nature relating to the D&O Insurance Policies (including any claims arising under such policies and all credits, proceeds, causes of action or rights thereunder) shall constitute Excluded Assets.").

things, that Porter Wright could not identify any colorable claims or causes of action for fiduciary breach against the Debtors' directors or executive officers. *See Debtors' Omnibus Reply to Objections to the Proposed Sale of Substantially All of the Debtors' Assets* [D.I. 1146], Ex. 1. Indeed, the Porter Wright Report did not uncover any information that would "even remotely" approach the factual bases necessary to overcome the strong protections of the business judgment rule under Ohio law. *Id.* at 25.[5] The Court ultimately credited the testimony of James King, a partner at Porter Wright, in approving the sale of estate causes of action against "continuing" directors and officers to Nexus.[6] However, for reasons that have been discussed previously and extensively, the Nexus Sale ultimately failed to close, and thus no estate causes of action were sold to Nexus.

15. Following the collapse of the Nexus Sale, and in order to preserve as much going concern value as possible, the Debtors quickly pivoted to consummating the GBRP Sale. The Debtors filed a motion to approve the GBRP Sale on December 27, 2024, and sought a hearing on December 30, 2024.[7] As originally contemplated, the GBRP APA would have transferred all Potential D&O Claims and D&O Policy Proceeds to GBRP. Over the weekend of December 28–29, 2024, the Debtors engaged in intense discussions with advisors to the Committee, during which the Debtors agreed to carve out any Potential D&O Claims against current or former directors and

---

[5] *See also* Nov. 21, 2024 Hr'g Tr. at 118:21–25 ("[Q.] So, Mr. King, the question was, what were your conclusions? [A.] Our conclusions were that we felt confident that we saw no colorable claims of breach of fiduciary duty against the debtors [*sic*] and officers of Big Lots under Ohio law.").

[6] *See* Nov. 22, 2024 Hr'g Tr. at 78:15–24 ("Although Blue Owl challenges the investigation process, the testimony of Mr. King, a partner at Porter Wright, the firm that conducted the investigation into potential D&O claims, established that the firm has experience with investigations, is well versed in Ohio corporate law, had full access to documentation, and conducted interviews of the vast majority of the Ds and Os. He testified there were no colorable claims of breach of fiduciary duty by Ds and Os under Ohio law; no contrary evidence was presented.").

[7] *See Motion of Debtors for Entry of an Order (I) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Under the GBRP APA, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 1437] (the "**GBRP Sale Motion**").

officers, as well as any D&O Policy Proceeds. The Debtors announced this agreement at the hearing on December 30, 2024, and the Committee stated their support for the GBRP Sale on the record. *See* Dec. 30, 2024 Hr'g Tr. at 28:6–13; 43:7–21. After a two-day contested hearing, the Court approved the GBRP Sale and entered an order approving the sale on January 2, 2025. *See generally* GBRP Sale Order.

16. The Committee subsequently continued its investigation into the Potential D&O Claims. As part of the Committee's investigation, the Debtors, the Settling D&Os, and each of their professional advisors engaged in a lengthy discovery process with the Committee. In response to the seven requests for production that the Committee served on the Debtors,[8] such parties turned over more than 25,000 documents (totaling more than 291,000 pages) for the Committee's review. In addition, over the course of its investigation the Committee took the deposition of the Debtors' general counsel twice, attended the deposition of the Debtors' financial advisor, took the deposition of James A. King, a partner at Porter Wright, and interviewed the Debtors' chief financial officer.[9]

---

[8] *See* Docket Nos. 559, 961, 962, 1118, 1459, 1734. The Committee served its *Notice of Fifth Request for the Production of Documents of the Official Committee of Unsecured Creditors Directed to the Debtors* (the "Fifth RFP") on November 20, 2024. It subsequently (and prior to filing a notice of service) withdrew the Fifth RFP without prejudice on November 27, 2024.

[9] The Committee also served multiple discovery requests on third parties. Specifically, the Committee served requests for production on PNC Bank, National Association ("**PNC**"), the administrative agent under the Debtors' prepetition ABL facility; (ii) 1903P Loan Agent, LLC ("**1903P**"), the administrative agent under the FILO Transaction (defined below); (iii) Gateway BL Acquisition, LLC ("**Gateway**"), an affiliate of Nexus and the stalking horse bidder under the Nexus Sale; (iv) GBRP; and (v) Variety Wholesalers, Inc. ("**Variety**"). *See* Docket Nos. 600, 601, 602, 965, 1460, 1461. In response to these third-party requests for production, the Committee received and reviewed some 13,000 documents—1,939 from PNC, 5,054 from 1903P, and 5,913 from GBRP.

In addition, the Committee served (i) two sets of interrogatories on the Debtors seeking written responses to twelve key questions; (ii) one set of interrogatories on Gateway, seeking written responses to five key questions; (iii) one set of interrogatories on Variety, seeking written responses to seven key questions; and (iv) one set of interrogatories on GBRP seeking written responses to seven key questions. *See* Docket Nos. 960, 963, 1459, 1460, 1461.

17. Following the discovery process, on May 16, 2025, counsel to the Committee served a demand letter and an accompanying draft complaint (together, the "**Demand Letter**") on counsel to the Settling D&Os, setting forth causes of action for alleged breaches of fiduciary duty arising from the following three transactions: (1), the approval by the Debtors' Board of Directors (the "**Board**") of a shareholder dividend in February 2023 (the "**Dividend Transaction**"); (2) the Debtors' entry into a first-in, last-out term loan facility in May 2024 (the "**FILO Transaction**"); and (3) the Debtors' actions in connection with the failed sale to Nexus (the "**Nexus Transaction**" and, together with the Dividend Transaction and the FILO Transaction, the "**Investigated Transactions**").

18. In response to the Demand Letter, the Settling D&Os vehemently denied all allegations and explained that they acted, at all times, in accordance with their fiduciary duties and with the best interests of the Debtors in mind. However, to avoid the risk, cost and delay of litigation, and with Berkshire's consent, the Settling D&Os engaged in good faith, extensive and arm's length negotiations to settle the Potential D&O Claims in exchange for a payment to the estates from the insurance coverage held by the Debtors in favor of the Settling D&Os. *See* LaPuma Decl., ¶ 5-8.

19. After several exchanges of settlement proposals, and numerous discussions amongst counsel to the Parties, on August 15, 2025, counsel to the Settling D&Os sent a revised settlement proposal to the Committee, which the Committee accepted on August 17, 2025. *See* LaPuma Decl., ¶ 8. Following the Parties' agreements on terms in principle, the Parties moved quickly to document the settlement, which resulted in the Parties executing the Settlement Agreement on September 17, 2025. *See* LaPuma Decl., ¶ 9.

C.  **The Settlement Agreement**

20. The Settlement Agreement includes the following key terms:[10]

   a. <u>Effectiveness</u>. The Settlement Agreement shall become effective on the first date on which the following conditions precedent have been satisfied (such date, the "**Effective Date**"): (i) each of the Parties, or their respective representatives, shall have executed and delivered counterparty signature pages of the Settlement Agreement to counsel to each of the Parties; (ii) this Court shall have entered an order, substantially in the form of the Proposed Order, pursuant to Federal Rule of Bankruptcy Procedure 9019 approving the Settlement Agreement; and (iii) the Proposed Order shall have become a final, non-appealable order.

   b. <u>Settlement Payment</u>. Consistent with the terms and conditions of the Berkshire D&O Policy, the Settling D&Os will cause Berkshire to pay $6.5 million (the "**Settlement Amount**") to the Debtors by no later than one (1) business day following the Effective Date.

   c. <u>Releases by Debtors</u>. Effective immediately upon receipt of the Settlement Payment, each of the Debtor Releasing Parties, their respective successors and assigns (including, without limitation, a chapter 7 trustee, if any) hereby forever releases and discharges each of the Creditors' Committee Released Parties and each of the D&O Released Parties from any and all Claims, Causes of Action, suits, charges, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, appraisal rights, interest, torts, controversies, agreements, promises, variances, trespasses, obligations, liabilities, proceedings, orders, damages, rights, executions, judgments, liens, costs, attorneys' fees, losses, expenses, demands and remedies of any nature, whether known or unknown, existing or potential, foreseeable or unforeseeable, liquidated or unliquidated, insured or uninsured, or at law or equity, that any of the Debtor Releasing Parties had or have ever had or may hereafter have against any of the Creditors' Committee Released Parties or the D&O Released Parties, as applicable, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world through and including the Settlement Effective Date, including, without limitation: (i) any D&O Claims; (ii) the Asserted Claims; (iii) any Unknown Claims, and (iv) any and all other Claims and Causes of Action arising out of or relating to: (x) the Debtors, the Estates and the Chapter 11 Cases; (y) any action, inaction (whether contemplated or not), or decision whatsoever made by the D&Os in their capacity as directors and officers of the Debtors

---

[10] This summary is provided solely for ease of reference and is qualified in its entirety by reference to the Settlement Agreement, the actual terms of which are controlling here. *See* Ex. C. Capitalized terms used but not otherwise defined in this paragraph shall have the meanings ascribed to such terms in the Settlement Agreement.

        (including, for the avoidance of doubt, with respect to and during the Chapter 11 Cases); and (z) the negotiation or execution of the Settlement Agreement; provided, none of the foregoing releases set forth in Section 6(a) of the Settlement Agreement, and nothing otherwise set forth in the Settlement Agreement, shall release the Parties from any obligations they may have under the Settlement Agreement, nor foreclose the right of any Party to enforce the terms of the Settlement Agreement.

    d.    <u>Releases by Committee</u>.  Effective immediately upon receipt of the Settlement Payment, each of the Creditors' Committee Releasing Parties hereby forever releases and discharges: each of the D&O Released Parties from any and all Claims, Causes of Action, suits, charges, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, appraisal rights, interest, torts, controversies, agreements, promises, variances, trespasses, obligations, liabilities, proceedings, orders, damages, rights, executions, judgments, liens, costs, attorneys' fees, losses, expenses, demands and remedies of any nature, whether known or unknown, existing or potential, foreseeable or unforeseeable, liquidated or unliquidated, insured or uninsured, or at law or equity, that any of the Creditors' Committee Releasing Parties had or have ever had or may hereafter have, whether direct or derivatively on behalf of the Debtors or their Estates, against any of the D&O Released Parties, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world through and including the Settlement Effective Date, including, without limitation: (i) any D&O Claims; (ii) the Asserted Claims; (iii) any Unknown Claims, and (iv) any and all other Claims and Causes of Action arising out of or relating to: (x) the Debtors, the Estates and the Chapter 11 Cases; (y) any action, inaction (whether contemplated or not), or decision whatsoever made by the D&Os in their capacity as directors and officers of the Debtors (including, for the avoidance of doubt, with respect to and during the Chapter 11 Cases); and (z) the negotiation or execution of the Settlement Agreement; provided, none of the foregoing releases set forth in Section 6(c) of the Settlement Agreement, and nothing otherwise set forth in the Settlement Agreement, shall release the Parties from any obligations they may have under the Settlement Agreement, nor foreclose the right of any Party to enforce the terms of the Settlement Agreement.

    e.    <u>Releases by Settling D&Os</u>.  Effective immediately upon receipt by the Debtors of the Settlement Payment, each of the D&O Releasing Parties hereby forever releases and discharges each of the Creditors' Committee Released Parties from any and all Claims, Causes of Action, suits, charges, debts, dues, sums of money, accounts,

reckonings, bonds, bills, specialties, covenants, contracts, appraisal rights, interest, torts, controversies, agreements, promises, variances, trespasses, obligations, liabilities, proceedings, orders, damages, rights, executions, judgments, liens, costs, attorneys' fees, losses, expenses, demands and remedies of any nature, whether known or unknown, existing or potential, foreseeable or unforeseeable, liquidated or unliquidated, insured or uninsured, or at law or equity, that any of the D&O Releasing Parties had or have ever had or may hereafter have against any of the Creditors' Committee Released Parties, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world through and including the Settlement Effective Date, including, without limitation: (i) any Unknown Claims, and (ii) any and all other Claims and Causes of Action arising out of or relating to (y) the Debtors, the Estates and the Chapter 11 Cases; and (z) the negotiation or execution of this Agreement; provided, none of the foregoing releases set forth in Section 6(d) of the Settlement Agreement, and nothing otherwise set forth in the Settlement Agreement, shall release the Parties from any obligations they may have under this Agreement, nor foreclose the right of any Party to enforce the terms of the Settlement Agreement.

f. <u>Injunction</u>.  The Parties agree to include an injunction provision in the Proposed Order that shall provide that, upon entry of the Settlement Order, all parties (such parties, each an "**Enjoined Party**") are and shall be permanently enjoined from taking any actions to interfere with the implementation of the Settlement Agreement, including, directly or indirectly: (i) commencing, conducting, or continuing in any manner any D&O Claim, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order in connection with any D&O Claim, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien, or encumbrance of any kind in connection with any D&O Claim, and (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Settlement Agreement and Proposed Order. For the avoidance of doubt, such injunction shall extend and apply to any successors of the Debtors and the Committee, including, but not limited to, a chapter 7 trustee appointed in the event of conversion of the Chapter 11 Cases to chapter 7 cases.

g. <u>Gatekeeper Provision</u>.  The Parties agree to include a "gatekeeper" provision in the Proposed Order that shall provide that, upon entry

> of the Proposed Order, no Enjoined Party may commence or pursue a D&O Claim without the Court (i) first determining, after notice and a hearing, that such D&O Claim represents a Claim of any kind that is not released pursuant to paragraph 6(a) or 6(c) of the Settlement Agreement, and (ii) specifically authorizing such Enjoined Party to bring such Claim or Cause of Action against one or more of the D&O Released Parties.

21. As further described in the LaPuma Declaration, the Settlement Agreement is supported by Elizabeth LaPuma, independent director of the Debtors.

## **BASIS FOR RELIEF REQUESTED**

22. The Court has the authority to "approve a compromise or settlement" pursuant to Federal Rule of Bankruptcy Procedure 9019(a). To exercise this authority, the Court must determine that the proposed settlement is "fair and equitable." *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

23. In evaluating the fairness and equity of a proposed settlement, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Specifically, the Court must consider the following factors: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending to it; and (d) the paramount interest of creditors. *Martin*, 91 F.3d at 393. The Court also may consider "the extent that the settlement is truly the product of arms-length bargaining, and not fraud or collusion." *In re Tribune Co.*, 464 B.R. 126, 155 (Bankr. D. Del. 2011).

24. Each of these factors weighs in favor of approval of the Settlement Agreement.

**A.    Probability of Success in Litigation**

25. The Potential D&O Claims consist primarily of claims against the current and former directors and officers of the Debtors for alleged breaches of fiduciary duty, including in connection with the Investigated Transactions.

26. The Settling D&Os contend that they faithfully exercised their duties as prudent fiduciaries of Big Lots. Specifically, the Settling D&Os assert that their actions in connection with the Potential D&O Claims would be subject to the business judgment rule, which has been codified as Section 1701.59 of the Ohio Revised Code ("**O.R.C. § 1701.59**") with respect to directors and Section 1701.641 of the Ohio Revised Code ("**O.R.C §1701.641**") with respect to officers, and that their actions were those of a reasonable "an ordinarily prudent person in a like position" at the time the underlying transactions were entered into. Specifically, the Settling D&Os have argued that any claims for breach of fiduciary duty would be governed by the deferential "business judgment" rule set forth in ORC § 1701.59 and ORC § 1701.641, which, among other things, requires a plaintiff to prove any breach of fiduciary duty claim by clear and convincing evidence rather than by a mere preponderance. *ORC §§ 1701.59(D)(1); 1701.641(C)(1)*. In addition, the Settling D&Os have set forth specific factual rebuttals to the Potential D&O Claims in their August 15 letter. Among other things, they have pointed to specific documents in the record that they argue show that the Settling D&Os performed reasonable diligence with respect to all three Investigated Transactions, which provided a reasonable basis to conclude that the Investigated Transactions were in the Debtors' best interests. Moreover, and importantly, in order to find an Ohio director or officer personally liable for a breach of fiduciary duty, a plaintiff would have to prove, again by clear and convincing evidence, rather than a preponderance, that the director or officer's "action or failure to act involved an act or omission [was] undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests

of the corporation." *ORC §§ 1701.59; 1701.641*. Accordingly, assuming that a case were not dismissed as a matter of law under ORC §§ 1701.59; 1701.641, there are significant disputes of fact that the ultimate fact finder would have to adjudicate in the absence of the Settlement Agreement.

27. Both the Debtors and the Committee recognize that the probability of success remains subject to substantial risk and uncertainty and that a risk-based discount is appropriate in resolving the Potential D&O Claims at this early stage. The $6.5 million settlement amount is certainly within the reasonable range of possibilities were the Committee to seek derivative standing to bring the Potential D&O Claims. *See In re Wash. Mut., Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011) ("The court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within the reasonable range of litigation possibilities.").

**B.      Difficulties in Collection in the Litigation**

28. Even if the Committee were to prevail on (a) obtaining derivative standing to bring the Potential D&O Claims, and (b) obtaining a judgment in connection with such litigation, the Committee would likely encounter difficulties in collecting on any such judgment. For example, there would be substantial erosion of the insurance policies covering the Potential D&O Claims as a result of the time—likely measured in years—it would take to litigate the Potential D&O Claims to conclusion and exhaust all appeals. *See, e.g., In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005) (noting that "[t]he collection of a judgment could be further delayed by the potential for appeal by the Defendant" in weighing the "difficulties in collection" factor), *aff'd*, No. 03-10323, 2006 WL 2842462 (D. Del. Oct. 2, 2006). And, to the extent that insurance was not available following the eventual resolution of any appeal, the Committee would need to engage

in costly post-judgment collection efforts against each of the Settling D&Os. *See, e.g., Donovan v. Robbins*, 752 F.2d 1170, 1182 (7th Cir. 1985) ("[B]ecause it is so difficult to collect large judgments from individuals unless they have insurance coverage, it is natural and ordinarily reasonable for a plaintiff to settle for the limits of that coverage.").

**C.     Complexity, Expense, and Delay of the Litigation**

29.     The Committee would face a complex, lengthy, and expensive process in litigating the Potential D&O Claims.  Such claims are highly factual in nature, raise difficult questions regarding the operations of a large, public company over a period of several years, and involve more than a dozen potential defendants.  These questions would require costly testimony related to the Board's actions, as well as extensive briefing on Ohio corporate law—specifically, to prove personal liability, whether there is clear and convincing evidence that the Settling D&Os' "action or failure to act involved an act or omission [was] undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation." Ohio Rev. Code. §§ 1701.59; 1701.641.  Finally, these questions would likely not be ripe for decision on dispositive motions, thereby requiring a lengthy, expensive trial and subsequent appeals.

**D.     Paramount Interest of Creditors as to the Litigation**

30.     The Debtors and the Committee believe that the paramount interest of creditors would be served by approving the Settlement Agreement.  The settlement—for a payment of $6.5 million—would allow the Debtors and Committee to liquidate the Potential D&O Claims, while avoiding substantial costs, delays, and risks of litigation.

**E.     Arm's-Length and Good-Faith Settlement Negotiations as to the Litigation**

31.     The Settlement Agreement is the product of arm's-length and good-faith negotiations spanning over multiple months. The Committee undertook an extensive investigation into the Potential D&O Claims and the Parties engaged in multiple teleconferences, meetings and correspondence, where they exchanged rounds of offers and counteroffers. Eventually, these negotiations ultimately resulted in the Settlement Agreement.

32.     Thus, given this extensive process, the Settlement Agreement is clearly the product of arm's-length negotiations. Indeed, as set forth in the LaPuma Declaration, this settlement is "the product of arm's-length, good-faith negotiations and represents a fair and reasonable outcome with respect to the Potential D&O Claims." *Id.* ¶ 11.

## **NOTICE**

33.     The Debtors have provided notice of this Motion to the following: (a) the United States Trustee for the District of Delaware; (b) Katten Muchin Rosenman LLP, counsel to the Settling D&Os; (c) Cole Schotz P.C. and McDermott Will & Schulte LLP, counsel to the Committee; (d) counsel to Berkshire; and (e) all parties who have requested notice under Federal Rule of Bankruptcy Procedure 2002. In light of the relief requested in this Motion, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors and Committee respectfully request entry of the Proposed Order, substantially in the form attached as **Exhibit B**, (a) approving the Settlement Agreement; (b) authorizing the parties to take any and all actions necessary to effectuate the Settlement Agreement; and (c) granting such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

Dated: September 18, 2025

<table>
<tr><td>

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Casey B. Sawyer*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4227)
Sophie Rogers Churchill (No. 6905)
Casey B. Sawyer (No. 7260)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
srchurchill@morrisnichols.com
csawyer@morrisnichols.com

</td><td>

**COLE SCHOTZ P.C.**

*/s/ Justin Alberto*
Justin R. Alberto (No. 5126)
Stacy L. Newman (No. 5044)
Jack M. Dougherty (No. 6784)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Tel: (302) 652-3131
jalberto@coleschotz.com
snewman@coleschotz.com
jdougherty@coleschotz.com

*-and-*

Sarah A. Carnes, Esq. (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Tel: (212) 752-8000
scarnes@coleschotz.com

</td></tr>
<tr><td>

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (admitted *pro hac vice*)
Adam L. Shpeen (admitted *pro hac vice*)
Stephen D. Piraino (admitted *pro hac vice*)
Ethan Stern (admitted *pro hac vice*)
Kevin L. Winiarski (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
brian.resnick@davispolk.com
adam.shpeen@davispolk.com
stephen.piraino@davispolk.com
ethan.stern@davispolk.com
kevin.winiarski@davispolk.com

*Counsel to the Debtors and Debtors in Possession*

</td><td>

**MCDERMOTT WILL & SCHULTE LLP**

Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
Joel C. Haims (admitted *pro hac vice*)
Stacy Lutkus (admitted *pro hac vice*)
Natalie Rowles (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY, 10017
Tel: (212) 547-5400
dazman@mwe.com
kgoing@mwe.com
jhaims@mwe.com
salutkus@mwe.com
nrowles@mwe.com

*Counsel to the Committee*

</td></tr>
</table>