## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket No. 3166** |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' STATEMENT IN SUPPORT OF THE MOTION TO APPROVE THE D&O SETTLEMENT AGREEMENT

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 cases of Big Lots, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors", "Big Lots", or the "Company"), by its undersigned counsel, files this statement in support of the *Joint Motion of Debtors and the Official Committee of Unsecured Creditors to Approve Entry into Settlement Agreement with Certain Officers and Directors of the Debtors Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9019* [Docket No. 3166] (the "9019 Motion").

## I.    Scope of Investigation

Commencing shortly after the Committee's formation, counsel to the Committee undertook an investigation to determine whether the Debtors' estates hold potential claims and causes of action against any of Big Lots' current or former directors (the "Board") and officers.

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows:  Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277).  The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

The investigation spanned roughly from September 2024 to May 2025. The investigation focused initially on 32 current and former directors and officers and, after careful review, was narrowed to 17 directors and officers. The investigation examined the actions and inactions of the Board as well as the Company's officers to determine whether such actions or inactions give rise to colorable claims. At the outset, the potential causes of action were not limited, nor was the scope of the conduct that was analyzed. Over the course of the investigation, the scope was narrowed to conduct that could constitute a breach of fiduciary duty under Ohio law.

**II.    Background**

**A.    Corporate History**

Big Lots was a home discount retailer with a more than 50-year history of customer good will and brand loyalty. The Company was also an investor favorite, with a stock price reaching a high of over $70 per share as recently as March 2021. But just over three years later, in September 2024, Big Lots filed for chapter 11 bankruptcy protection. That proceeding ultimately left the Debtors administratively insolvent, with administrative creditors receiving impaired recoveries and general unsecured creditors receiving no recovery at all.

Headquartered in Columbus, Ohio, as of September 9, 2024, the date on which the Company filed its voluntary petitions for relief under chapter 11 (the "Petition Date"), Big Lots operated more than 1,300 stores across 48 states, as well as an e-commerce store with expanded fulfillment and delivery capabilities. Big Lots was founded in 1967 and initially operated under the brand name Consolidated International, Inc. In the decades that followed, the Company completed a series of acquisitions and expansions, ultimately assembling a portfolio of closeout stores operating under various brand names. In 2001, Consolidated International, Inc. changed its name (and the names of its portfolio of closeout stores) to Big Lots, Inc., bringing all brands

under the Big Lots umbrella.  As of the Petition Date, Big Lots was the fourth largest home goods retailer in the United States, generating operating revenues of approximately $4.7 billion in 2023.

Big Lots marketed and sold an assortment of products and merchandise in varied categories, such as food, consumables (e.g., health, beauty, cosmetic, plastic, paper, pet, infant, and stationery), soft home products (e.g., apparel, hosiery, jewelry, frames, bedding, bath, window, decorative textiles, and rugs), hard home products (e.g., small appliances, table top, food preparation, home maintenance and organization, toys, and electronics), furniture (e.g., upholstery, mattresses, ready-to-assemble, and home décor) and seasonal products (e.g., lawn and garden, summer, and holiday).  These products were sold to customers across the country utilizing "brick and mortar" and online direct-to-customer sales channels.

Big Lots, Inc. was an Ohio corporation and a public holding company that was the ultimate parent of 18 direct or indirect subsidiaries, all of which are Debtors.  Big Lots began trading on the American Stock Exchange in 1985.  In 1986, the Company switched its listing to the New York Stock Exchange, where its common shares (the "Common Stock") traded under the ticker symbol "BIG."  As of the Petition Date, Big Lots, Inc. had 298,000,000 shares of Common Stock authorized and, as of June 7, 2024, 29,681,973 shares of Common Stock outstanding.

### B.    Business Performance

In the years following consolidation under the Big Lots brand, the Company maintained competitive positioning as the country's largest broadline closeout retailer, focusing on delivering tremendous value to its customers.  As a result, Big Lots realized meaningful growth across its product categories and experienced five consecutive years of record earnings between

2007 and 2011.  Between 2013 and 2018, Big Lots reoriented its commercial strategy to prioritize the sale of national brands and everyday items and deemphasize its closeout product categories and extreme bargain penetration.  This change in commercial priorities resulted in increased average product prices, decreased customer traffic, and stagnated sale volumes.  In addition, the shift away from a longtime commitment to sourcing discounted products contributed to a loss of significant market share in Big Lots' historically strong bargain merchandise vertical.  In 2018 and 2019, a new leadership and management team was installed with a mandate to revitalize Big Lots' core mission and focus on augmenting store relevance, excelling in omnichannel operations, and enhancing overall productivity.

In early 2020, Big Lots was required to devote significant attention and resources to addressing the external challenges surrounding the COVID-19 pandemic, which hampered peers across the retail industry.  Initially, customers stockpiled Big Lots' essential food and consumables merchandise.  In the months thereafter, the release of government stimulus and unemployment funds, coupled with the continuation of social distancing policies, encouraged customers to make significant investments in their homes.  These trends combined to drive continued demand for Big Lots' furniture, soft home, and hard home products through the balance of 2020.  As a result, Big Lots' financial results soared during the pandemic.

For example, the Company's net sales leapt from $5.3 billion in 2019 to $6.2 billion in 2020, a nearly 17% increase.  Similarly, the Company's net income increased from $242 million in 2019 to $629 million in 2020, an approximate 160% surge.  Earnings per share likewise jumped from $6.18 in 2019 to $16.46 in 2020, a greater than 166% increase.  And the Company's cash and cash equivalents increased dramatically from $52 million in 2019 to $559 million in 2020, a greater than 10-fold spike.  Reflecting these financial results, Big Lots' stock

price rose throughout 2020.  After experiencing a low of around $10 per share in March 2020, the stock ultimately hit a high of over $72 per share in March 2021.

However, these financial results could not be sustained.  In the aftermath of COVID-19, the U.S. economy faced inflationary and macroeconomic pressures.  These pressures undermined the buying power of Big Lots' core customers, resulting in decreased net sales, and increased Big Lots' selling and administrative expenses.  Thus, the Company's gross margin as a percentage of net sales decreased.  Over the subsequent months and years, Big Lots' financial results faced a consistent, steep downward trend.  The Company's annual revenue fell from $6.2 billion in 2020 to $4.7 billion in 2023, a decline of almost 25%.  Other metrics similarly declined, which decline was reflected in the Company's stock—it went from trading above $70 in early 2021 to being delisted less than four years later.  Ultimately, Big Lots' financial position would never recover, with the Company filing for bankruptcy protection in September 2024.

## III.    Applicable Legal Standard

Because Big Lots is an Ohio corporation, Ohio law will apply to a fiduciary duty claim analysis.  *Glob. Launch, Inc. v. Wisehart*, 925 N.E.2d 698, 699 (Ohio Com Pl. 2010) (under the internal affairs doctrine, "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation") (internal quotation marks and citations omitted).  The duties of directors are prescribed by Ohio Revised Code section 1701.59(B): "A director shall perform the director's duties as a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."  Officers are held to the same standard: "An officer shall perform the officer's

duties to the corporation in good faith, in a manner the officer reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." Ohio Rev. Code § 1701.641(B).

The fiduciary relationship encompasses a duty of care, duty of good faith, duty of loyalty, a duty to refrain from self[-]dealing, and a duty of disclosure. *Antioch Co. Litig. Tr. v. Morgan*, No. 3:10-CV-156, 2013 WL 3976671, at *6 (S.D. Ohio Aug. 2, 2013). Based on an analysis of applicable case law and statutes, counsel for the Committee determined to focus on two Ohio fiduciary duties—the duty of care and the duty of loyalty.

### A.    Duty of Care

Generally, directors and officers have an affirmative duty to act diligently and prudently in carrying out the affairs of the corporation. Under Ohio law, "the duty of care requires a director to exercise 'the care that an ordinarily prudent person in a like position would use under similar circumstances.'" *Vontz v. Miller*, 111 N.E.3d 452, 462 (Ohio Ct. App. 2016) (quoting Ohio Rev. Code § 1701.59(B)). Directors and officers "have a duty to inform themselves of all material information reasonably available to them prior to the decision" at issue and then "must act with the requisite care in the discharge of their duties in making their decision" *McNamara v. Ashworth*, No. 9-92-31, 1992 WL 352641, at *3 (Ohio Ct. App. Nov. 25, 1992). Thus, directors and officers generally must: (i) use the amount of care that an ordinarily careful and prudent person would use in similar circumstances; and (ii) consider all material information reasonably available in making business decisions. The analysis focuses on the decision-making process and not the outcome of said decision.

6

Although the precise behavior that will qualify as a breach of the duty of care varies depending on context, breaches of the duty of care are often found where directors or officers failed to inform themselves fully and in a deliberate manner before deciding on a course of action with significant implications for the corporation.  However, deficiencies in the directors' or officers' process typically are actionable only if such actions go beyond simple negligence. For directors of Ohio corporations, liability for damages requires proof by clear and convincing evidence "that the director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation."  Ohio Rev. Code § 1701.59(E).  The standard is the same for officers.  *Id.* § 1701.641(D).  Thus, a "director or officer may be held liable in damages for a breach of fiduciary duty under Ohio law only where he has acted with 'deliberate intent' or 'reckless disregard.'"  *In re Goodyear Tire & Rubber Co. Derivative Litig.*, No. 5:03CV2180, 2007 WL 43557, at *9 (N.D. Ohio Jan. 5, 2007).

### B.    Duty of Loyalty

Under Ohio law, "the duty of loyalty requires a director to 'perform * * * in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation."  *Vontz*, 111 N.E.3d at 462 (alterations in original) (citation omitted).  "If a director is not disinterested or has engaged in self-dealing, the decision is not void but will be closely scrutinized."  *Maas v. Maas*, 161 N.E.3d 863, 876 (Oh. Ct. App. 2020).  "In that case, the director will be required to show that the transaction was fair and reasonable to the corporation notwithstanding the director's personal interest."  *Id.* (citation omitted).  To establish a breach of the fiduciary duty of loyalty, a challenger usually must show that the defendants either (i) stood

on both sides of the transaction and dictated its terms in a self-dealing way, or (ii) received in the transaction a personal benefit that was not enjoyed by shareholders or creditors generally.

### C.    Business Judgment Rule

Directors and officers of Ohio corporations enjoy the benefit of the business judgment rule.  *Maas*, 161 N.E.3d at 872 ("Ohio courts adhere to the 'business judgment rule.'").  The business judgment rule operates as a presumption that in making a business decision not involving self-interest, directors and officers act on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.  *Reister v. Gardner*, 174 N.E.3d 713, 716 (Ohio 2020) (citation omitted).  "Under that rule, courts will not inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith, or abuse of discretion."  *Maas*, 161 N.E.3d at 872 (citing *Koos v. Cent. Ohio Cellular, Inc.*, 641 N.E.2d 265, 272) (Ohio Ct. App. 1994)).  Unless the presumption is rebutted, the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives.  *Maas* at 873 (where the business judgment rule applies, "decisions of disinterested directors will not be disturbed if they can be attributed to any rational business purpose").  Further, by statute, directors and officers cannot be found to have violated their duties absent clear and convincing evidence that they failed to act in good faith, in the best interests of the corporation, or with due care.  *See* Ohio Rev. Code §§ 1701.59(D)(1); 1701.641(C)(1).

### D.    Other Statutory Protections

Directors and officers are also protected by Ohio Revised Code sections 1701.59(C) and 1701.641(B)(1)–(2) in relying in good faith on corporate records, information presented by company directors, officers, or employees, or information presented by a professional or expert

selected with reasonable care by the corporation.  To overcome these protections, a challenger would have to show, for example, that:

    (i)      the directors or officers did not rely on the professional or expert;

    (ii)     their reliance was not in good faith;

    (iii)    they did not believe the advice was within the professional's or expert's competence;

    (iv)    the professional or expert was not selected with reasonable care by or on behalf of the corporation, and the selection process was faulty;

    (v)     the subject matter that was material and reasonably available was so obvious that the failure to consider it was grossly negligent regardless of the advice or lack of advice; or

    (vi)    the decision was so unconscionable as to constitute waste or fraud.

## IV.    <u>Investigative Findings</u>

### A.    Details of Investigation

To conduct a thorough investigation, counsel for the Committee undertook the following key steps: (i) served formal discovery, including document production requests, deposition notices, and requests for interrogatories on various parties; (ii) reviewed written discovery responses and thousands of documents; (iii) deposed key witnesses; (iv) reviewed charter documents, Board and Board committee minutes, and related materials; (v) analyzed the investigative report prepared by Debtors' special counsel, Porter Wright Morris & Arthur LLP ("<u>Porter Wright</u>"); (vi) reviewed the director and officer insurance policies maintained by the Debtors (the "<u>D&O Policies</u>"); (vii) conducted legal research; and (viii) analyzed filings with the United States Securities and Exchange Commission (the "<u>SEC</u>").

In total, the Committee served seven requests for production on the Debtors.[2]  The Committee also served requests for production on: (i) PNC Bank, National Association ("PNC"), the administrative agent under the Debtors' ABL facility;[3] (ii) 1903P Loan Agent, LLC ("1903P"), the administrative agent under the Debtors' term loan facility;[4] (iii) Gateway BL Acquisition, LLC ("Gateway"), an affiliate of Nexus Capital Management LP and the initial stalking horse bidder for the Debtors' assets;[5] (iv) Gordon Brothers Retail Partners, LLC ("GBRP"), the Debtors' liquidation consultant and purchaser of certain of the Debtors' assets;[6] and (v) Variety Wholesalers, Inc. ("Variety"), an operational counterparty of GBRP in connection with its purchase of certain of the Debtors' assets.[7]

In response to its requests for production, the Committee received a total of 38,876 documents: (i) the Debtors provided 25,970 documents, (ii) PNC provided 1,939 documents, (iii) 1903P provided 5,054 documents, and (iv) GBRP provided 5,913 documents.  The Committee, by and through its professionals, reviewed and analyzed all produced documents.  In addition, the Committee was given access to a data room maintained by the Debtors in connection with the initial proposed sale of substantially all of their assets to Gateway.  The Committee reviewed, among other documents and communications, all Board meeting materials since January 2020, Big Lots' charter and bylaws documents, the D&O Policies, draft documents

---

[2]  *See* Docket Nos. 599, 961, 962, 1118, 1459, 1734.  The Committee served its *Notice of Fifth Request for the Production of Documents of the Official Committee of Unsecured Creditors Directed to the Debtors* (the "Fifth RFP") on November 20, 2024.  It subsequently—before having filed a Notice of Service thereof—withdrew the Fifth RFP without prejudice on November 27, 2024.

[3]  Docket No. 600.

[4]  Docket No. 602.

[5]  Docket No. 965.

[6]  Docket Nos. 601, 1461.

[7]  Docket No. 1460.

related to the Debtors' term loan facility, and draft versions of the stalking horse asset purchase agreement and related documents.

In addition to serving requests for production, the Committee also served (i) two sets of interrogatories on the Debtors seeking written responses to twelve key questions;[8] (ii) one set of interrogatories on Gateway, seeking written responses to five key questions;[9] (iii) one set of interrogatories on Variety seeking written responses to seven key questions;[10] and (iv) one set of interrogatories on GBRP seeking written responses to seven key questions.[11]  The responses to these interrogatories provided valuable insight into the Board's decision-making process and provided support for the Committee's investigative findings.

Finally, on November 18, 2024, and again on December 29, 2024, counsel to the Committee deposed the Debtors' Rule 30(b)(6) representative, Ronald A. Robins, Jr, who serves as the Debtors' chief legal officer, executive vice president, governance officer, general counsel, and corporate secretary.[12]  His deposition lasted roughly 4.5 hours.  Counsel to the Committee also deposed, on November 20, 2024, James A. King, a partner at Porter Wright, the law firm that led Debtors' investigation of potential claims against the directors and officers.[13]  Mr. King's deposition lasted roughly 3 hours.  Also on November 20, 2024, counsel to the Committee interviewed Jonathan Ramsden, the Debtors' executive vice president, chief financial officer, and chief administrative officer.  In addition, on December 30, 2024, counsel to the Committee

---

[8]     Docket Nos. 960, 1459.

[9]     Docket No. 963.

[10]    Docket No. 1460.

[11]    Docket No. 1461.

[12]    Docket Nos. 966, 1462.

[13]    Docket No. 1120.

attended the deposition of Kent Percy, Partner and Managing Director at AlixPartners, LLP, in connection with the *Motion of Debtors for Entry of an Order (I) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Under the GBRP APA, (III) Authorizing Assumption and Assignment of Executor Contracts and Unexpired Leases, and (IV) Granting Related Relief*.[14] These depositions helped narrow the focus of the investigation.

Based upon the discovery responses, depositions, Porter Wright's investigation, publicly available SEC documents, and tens of thousands of pages of documents, the Committee determined to focus its investigation on three potential breaches by certain directors and officers of their fiduciary duty of care owed to the Company and its stakeholders, including unsecured creditors. These three potential breaches arise from the directors' and officers' actions and inactions in connection with: (i) approval of the Company's final dividend payment in February 2023; (ii) entry into the Company's term loan facility in or about April 2024; and (iii) entry into that certain *Asset Purchase Agreement*, dated September 8, 2024, by and among the Company and Gateway (the "Stalking Horse APA"), and the Board's and management's failure to disclose sooner that the Company would be unable to meet certain closing conditions thereof.

**B.      Practical Considerations**

There are practical considerations when deciding whether to sue or to settle. Primarily, the cost and time of litigation must be weighed against an uncertain outcome. Litigation of this sort generally takes years to conclude and costs millions of dollars to prosecute. Even accepting the cost and time of litigation, there can be no guarantee of the outcome, regardless of the strength of the claims. Further, the Debtors' chapter 11 cases will likely soon be converted to

---

[14]   *See* Docket Nos. 1437, 1497.

12

cases under chapter 7, and the chapter 7 trustee may elect not to pursue these claims against the Company's directors and officers.  And, finally, during the course of litigation, additional information may come to light that could undercut the potential claims or weaken the arguments against any or all the defendants.

## V.    <u>Settlement</u>

Based on its investigative findings, on April 4, 2025, the Committee, through counsel, served a formal demand letter on the Debtors, demanding that the Debtors commence litigation against the directors and officers for their breaches of the fiduciary duties.  On May 16, 2025, the Committee, through counsel, served a formal demand letter and notice of complaint on counsel to the directors and officers, demanding monetary relief against the directors and officers, providing notice of certain facts and circumstances giving rise to claims, and attaching a draft complaint detailing such facts and claims.  On July 9, 2025, counsel to the directors and officers responded to the Committee's letter asserting that the Committee's claims lack merit and are highly unlikely to succeed, even if the Committee were able to establish standing to litigate. Over the next few weeks, settlement negotiations continued, leading to a settlement of $6.5 million, which the Committee endorsed on August 17, 2025, subject to the Court's approval.

For the reasons set forth herein and in the 9019 Motion, and following the Committee's extensive, months-long investigation, the Committee believes strongly that the settlement is in the best interests of creditors.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 18, 2025
         Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Stacy L. Newman*
Justin R. Alberto (No. 5126)
Stacy L. Newman (No. 5044)
Jack M. Dougherty (No. 6784)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Tel:    (302) 652-3131
Fax:    (302) 652-3117
Email: jalberto@coleschotz.com
         snewman@coleschotz.com
         jdougherty@coleschotz.com

*-and-*

Sarah A. Carnes, Esq. (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Tel:    (212) 752-8000
Fax:    (212) 752-8393
Email:  scarnes@coleschotz.com

*- and -*

**MCDERMOTT WILL & SCHULTE LLP**

Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
Joel C. Haims (admitted *pro hac vice*)
Stacy Lutkus (admitted *pro hac vice*)
Natalie Rowles (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY, 10017
Tel:    (212) 547-5400
Fax:    (212) 547-5444
Email: dazman@mwe.com
         kgoing@mwe.com
         jhaims@mwe.com
         slutkus@mwe.com
         nrowles@mwe.com

*Counsel to the Official Committee of
Unsecured Creditors*

14