## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BIG LOTS, INC., *et al.*, | Case No. 24-11967 (JKS) |
| Debtors.[1] | Jointly Administered |
| | **Re: Docket No. 3166** |
| | **Hearing Date: October 9, 2025 at 10:00 a.m. (ET)** |
| | **Obj. Deadline: October 2, 2025 at 4:00 p.m. (ET)** **(Extended for U.S. Trustee to October 6, 2025)** |

## UNITED STATES TRUSTEE'S OBJECTION TO THE JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO APPROVE ENTRY INTO SETTLEMENT AGREEMENT WITH CERTAIN OFFICERS AND DIRECTORS OF THE DEBTORS PURSUANT TO 11 U.S.C §105(A) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors to Approve Entry into Settlement Agreement with Certain Officers and Directors of the Debtors Pursuant to 11 U.S.C. §105(a) and Federal Rule of Bankruptcy Procedure 9019* [D.I. 3166] (the "Settlement Motion"), and in support of this Objection respectfully states:

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers, are as follows: Great Basin, LLC (6158); Big Lots, Inc. (9097); Big Lots Management, LLC (7948); Consolidated Property Holdings, LLC (0984); Broyhill LLC (7868); Big Lots Stores - PNS, LLC (5262); Big Lots Stores, LLC (6811); BLBO Tenant, LLC (0552); Big Lots Stores - CSR, LLC (6182); CSC Distribution LLC (8785); Closeout Distribution, LLC (0309); Durant DC, LLC (2033); AVDC, LLC (3400); GAFDC LLC (8673); PAFDC LLC (2377); WAFDC, LLC (6163); INFDC, LLC (2820); Big Lots eCommerce LLC (9612); and Big Lots F&S, LLC (3277). The address of the debtors' corporate headquarters is 4900 E. Dublin-Granville Road, Columbus, OH 43081.

## PRELIMINARY STATEMENT

The Settlement Motion proposes to settle certain potential D&O claims against 14 current and former officers and directors of the Debtors for a cash payment of $6.5 million. This, in and of itself, is not objectionable. But the Debtors and the Committee have also included a wholly inappropriate gatekeeping provision in the proposed settlement order. Unless this objectionable provision is removed, the Court should not approve the proposed settlement.

## JURISDICTION AND STANDING

1. This Court has jurisdiction to hear and determine the Settlement Motion and this Objection under: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued under 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

2. Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. The U.S. Trustee has standing to be heard on the Settlement Motion under 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### A.    The Chapter 11 Cases

4.    On September 9, 2024 (the "Petition Date"), each of the above-referenced debtors (the "Debtors") filed a voluntary chapter 11 petition for relief in the United States Bankruptcy Court for the District of Delaware. The Debtors remain in possession of their property and continue to manage their assets as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases, which are being jointly administered for procedural purposes only.

5.    On September 23, 2024, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").

6.    At a hearing on December 31, 2024, the Debtors received Court approval to consummate a sale (the "GBRP Sale") of substantially all of their assets to Gordon Brothers Retail Partners, LLC ("GBRP"). On January 2, 2025, the Court entered the *Order (I) Approving the Asset Purchase Agreement, (II) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of all Claims, Liens, Rights, Interests, Encumbrances, and Other Assumed Liabilities and Permitted Encumbrances, (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 1556] (the "GBRP Sale Order"). On January 3, 2025, the parties consummated the GBRP Sale.

7.    In order to obtain the Committee's support for the GBRP Sale, the Debtors and GBRP agreed to carve out both (a) all potential claims and causes of action held by the Debtors' estates against all current and former directors and officers of the Debtors and (b) the proceeds from any of the Debtors' D&O insurance policies (collectively, the "D&O Assets") from the sale

3

of substantially all of their assets to GBRP.  The D&O Assets, thus, constitute some of the few non-cash assets remaining in the Debtors' estates.

8.  Since its appointment, the Committee has been investigating the D&O assets, including by hiring counsel to conduct an independent investigation, engaging in multiple rounds of discovery and document review, deposing multiple witnesses, drafting a demand letter and proposed complaint, and exchanging several settlement proposals with the 14 current and former officers and directors (the "Settling D&Os").

9.  On September 17, 2025, the Debtors, the Committee, and the Settling D&Os executed a settlement agreement. Under its terms, the Debtors' former D&O insurer will pay the Debtors' estates $6.5 million in exchange for mutual releases by the Debtors and the Committee of the D&Os and the D&O insurer, among others.

10.  On September 18, 2025, the Debtors filed the Settlement Motion, along with a proposed order. The Settlement Motion stated that "The Parties agree to include a 'gatekeeper' provision in the Proposed Order that shall provide that, upon entry of the Proposed Order, no Enjoined Party may commence or pursue a D&O Claim without the Court (i) first determining, after notice and a hearing, that such D&O Claim represents a Claim of any kind that is not released pursuant to paragraph 6(a) or 6(c) of the Settlement Agreement, and (ii) specifically authorizing such Enjoined Party to bring such Claim or Cause of Action against one or more of the D&O Released Parties." Settlement Motion, ¶20(g).

11.  The Settlement Motion contained no other discussion of the proposed "gatekeeper provision," and failed to include any factual, evidentiary, or legal basis for it.

12.  The proposed "gatekeeper provision" in paragraph 7 of the proposed order (the "Gatekeeper Provision") approving the settlement provides:

**Gatekeeper**.  Upon entry of this Order, no Enjoined Party may commence or pursue a D&O Claim without the Court (i) first determining, after notice and a hearing, that such D&O Claim represents a Claim of any kind that is not released pursuant to this Order or paragraph 6(a) or 6(c) of the Settlement Agreement, and (ii) specifically authorizing such Enjoined Party to bring such Claim or Cause of Action against one or more of the D&O Released Parties.

13.    "Enjoined Party" is defined in paragraph 6 of the proposed order as "all persons and entities."

## OBJECTION

14.    The Gatekeeper Provision forces non-debtors who wish to pursue claims against other non-debtors to first come to this Court—and only this Court—for a determination of whether their claim is "a kind that is not released pursuant to this Order or paragraph 6(a) or 6(c)" of the parties' settlement agreement. The provision has no time limit, and so the Gatekeeper Provision would apply even after the debtors' bankruptcy cases have been closed, thereby requiring the non-debtor seeking to pursue a claim against another non-debtor to first move to reopen them.

15.    The proposed procedure is akin to the procedure described in *Barton v. Barbour*, 104 U.S. 126 (1881) prior to suing a bankruptcy trustee, and the Court should not approve it. The defense of "release" is an affirmative defense to a cause of action asserted in a court of law or other tribunal. Affirmative defenses cannot be adjudicated prior to the filing of the action to which such defense relates. Moreover, as to claims between non-debtors, there is no reason why the court in which the relevant action has been filed cannot make the determination as to whether the claim was released under the parties' settlement.

16.    In the context of plan confirmation, Judge Owens rejected a similar provision in *In re Gulf Coast Health Care, LLC*, et al., Case No. 21-11336, wherein she noted that "the plan says what it says and other courts should be entitled to exercise their authority to interpret it."

*See* Ex. A, May 4, 2022 Hearing Transcript at 30:16-23. Further, "imposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." *See id.*

17.     In connection with confirmation in the AIO, Inc. chapter 11 cases (*In re AIO, Inc., et al.*, Case No. 24-11836), Judge Goldblatt was asked to enter a confirmation order that contained a broad gatekeeper provision over the objection of the U.S. Trustee. When asked whether such a provision had ever been approved before, the only instance counsel could point to was Judge Goldblatt's own prior order authorizing a settlement between the AIO debtors and their former parent company.

18.     In his August 21, 2025 opinion regarding confirmation in AIO, Judge Goldblatt discussed the proposed gatekeeping provision in the plan as well as his prior approval of that type of provision in the settlement order. Judge Goldblatt held:

> Even as narrowed [by *In re Highland Capital Mgmt., L.P.,* 132 F.4th 353 (5th Cir. 2025)] however, this Court does not believe there is a basis for imposing a "gatekeeping" role. To be sure, it is settled law that estate fiduciaries may be exculpated from the assertion of claims that arise out of their exercise of their fiduciary duties. And it is customary and unobjectionable to back that exculpation by an injunction against the assertion of an exculpated claim. The Court does not understand the authority, however, for extending the injunction past the scope of the exculpation and other appropriate releases of estate claims themselves, to apply to claims that "could reasonably be characterized" as such a claim. More puzzling still, the "gatekeeping" injunction arrogates to this Court not only the authority to determine whether such a claim falls within the plan's injunction but also requires a finding by this Court that the underlying claim (over which the Court may or may not have subject-matter jurisdiction) is a "colorable" claim on the merits.
>
> Notwithstanding *Highland Capital* and the related Fifth Circuit authority (or the transcripts from oral rulings of bankruptcy courts in other jurisdictions), this Court does not believe that either the Bankruptcy Code or the *Barton* doctrine provides any substantive authority for the bankruptcy court to do anything like this. The parties have not identified any Third Circuit authority for such an injunction, and this Court is aware of none.

\* \* \*

Finally, however, notwithstanding the prior point, the Court now believes that the approach taken by the court in *Gulf Coast Health Care* is the better one. To be sure, this Court retains jurisdiction to resolve a dispute about the meaning of its order. And if a dispute were to arise in the future about whether a claim asserted in another court were actually enjoined by virtue of this Court's confirmation order, this Court would undoubtedly be willing to address the matter through a declaratory judgment action, rather than requiring another court to guess as to the meaning of this Court's order. That said, and despite the Court having done so in the settlement order in this case, the Court now believes that the better view is that it ought not assert *exclusive* jurisdiction over that issue. As the court said in *Gulf Coast Health Care*, to the extent another court were otherwise inclined to resolve a dispute over the meaning of this Court's order, the Court does not believe that it can or should enter an injunction that should preclude that.

The settlement order, of course, is now a final and non-appealable order. It says what it says, and the Court stands prepared to enforce it. With the benefit of hindsight, however, this Court does not believe that the entry of such a gatekeeping provision is authorized by law.

19.     The same concerns apply in this case. There is no basis for the Gatekeeper Provision and the Court should not approve the proposed settlement unless the Debtors remove it.

## **RESERVATION OF RIGHTS**

20.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things: (i) complement, supplement, augment, alter or modify this Objection; (ii) assert any objection; (iii) file any appropriate motion; (iv) conduct any and all discovery as may be deemed necessary or as may be required; and (v) assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying approval of the Settlement Motion; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: October 3, 2025                     Respectfully submitted,

                                           **ANDREW R. VARA**
                                           **UNITED STATES TRUSTEE**
                                           **REGIONS 3 AND 9**

                                     By: */s/ Hannah J. McCollum*
                                           Linda Casey, Esq.
                                           Hannah McCollum, Esq.
                                           Trial Attorneys
                                           United States Department of Justice
                                           Office of the United States Trustee
                                           J. Caleb Boggs Federal Building
                                           844 N. King Street, Room 2207, Lockbox 35
                                           Wilmington, DE 19801
                                           Telephone: (302) 573-6491
                                           Email:   linda.casey@usdoj.gov
                                                    hannah.mccollum@usdoj.gov

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  | . | Chapter 11 |
|---|---|---|
| IN RE: | . | |
|  | . | Case No. 21-11336(KBO) |
| GULF COAST HEALTH CARE, LLC, | . | |
| et al, | . | |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . | |
| . . . . . . . . . . . . . . . | . | Wednesday, May 4, 2022 |

TRANSCRIPT OF VIDEO HEARING RE:
CONFIRMATION - COURT DECISION
BEFORE THE HONORABLE KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:            David R. Hurst, Esq.
                           Daniel M. Simon, Esq.
                           Emily C. Keil, Esq.
                           MCDERMOTT, WILL & EMERY, LLP


For the U.S. Trustee:       Joseph Cudia, Esq.
                           Juliet Sarkessian, Esq.
                           Richard Schepacarter, Esq.
                           OFFICE OF THE U.S. TRUSTEE


For the Official Committee
of Unsecured Creditors:     David Kurzweil, Esq.
                           Eric Howe, Esq.
                           Joseph Davis, Esq.
                           Nancy Peterman, Esq.
                           GREENBERG TRAURIG, LLP



(Appearances Continued)

Audio Operator:             Electronically Recorded
                           by Leslie Murin, ECRO

Transcription Company:      Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES VIA ZOOM:  (Continued)

For Barrow Street Capital:  Alana Page, Esq.
                            Kelly A. Cornish, Esq.
                            Matthew Stachel, Esq.
                            Miriam Levi, Esq.
                            PAUL, WEISS, RIFKIND, WHARTON
                             & GARRISON, LLP

For the United States:      Alexis Daniel, Esq.
                            Augustus Curtis, Esq.
                            U.S. DEPARTMENT OF JUSTICE

For Vista Clinical
Diagnostics, LLC:           Andrew Ballentine, Esq.
                            SHUMAKER, LOOP & KENDRICK, LLP

For the Florida
Plaintiffs:                 Andrew Brown, Esq.
                            Jesse Noa, Esq.
                            R. Stephen McNeill, Esq.
                            POTTER, ANDERSON & CORROON, LLP

                            Blair Mendes, Esq.
                            MENDES, REINS & WILANDER, PLLC

                            James Wilkes, II, Esq.
                            WILKES & ASSOCIATES, PA

For Regions Bank:           Cory Falgowski, Esq.
                            BURR & FORMAN, LLP

For Affiliate:              DANTE SKOURELLOS, ESQ.

For the Estates of
Domenica B. Castellano,
Francis I. Einstein,
Robert F. Einstein, Sr.,
Shelley A. Tambling:        Douglas Candeub, Esq.
                            MORRIS JAMES, LLP


(Appearances Continued)
```

APPEARANCES VIA ZOOM:   (Continued)

| | |
|---|---|
| For OHI Asset Funding (DE), LLC and the Omega Landlords: | Eric Schwartz, Esq.<br>Jonathan Weyland, Esq.<br>MORRIS, NICHOLS, ARSHT<br> & TUNNELL, LLP |
| | Jason Hufendick, Esq.<br>Robert Lemons, Esq.<br>Shreya Gulati, Esq.<br>WEIL, GOTSHAL & MANGES, LLP |
| | Leighton Aiken, Esq.<br>FERGUSON BRASWELL FRASER<br> KUBASTA, PC |
| For Omnicare, Inc. and its Affiliates: | Geoffrey Goodman, Esq.<br>Tamar Dolcourt, Esq.<br>FOLEY & LARDNER, LLP |
| For New Ark Capital, LLC: | James Muenker, Esq.<br>Jason Hopkins, Esq.<br>Stuart Brown, Esq.<br>DLA PIPER, LLP (US) |
| For Medline Industries, Inc.: | Jordana Renert, Esq.<br>LOWENSTEIN SANDLER, LLP |
| For Bradford: | KIMBERLY GIANIS, ESQ. |
| Patient Care Ombudsman: | MARK FISHMAN |
| Also Appearing: | Dara Cooley, Esq.<br>DARA COOLEY LAW, PA |
| | Jason Gerstein<br>Matt Shelton<br>Scott Vogel<br>GULF COAST HEALTH CARE |
| | Allison Axenrod<br>CRG FINANCIAL, LLC |

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:                    Ben Jones
                                   Swapna Deshpande
                                   ANKURA CONSULTING GROUP, LLC

                                   Caroline Salls
                                   NEW GENERATION RESEARCH

                                   Clifford Zucker
                                   Earnestiena Cheng
                                   Narendra Ganti
                                   FTI CONSULTING

                                   Eric Roth
                                   HEALTH CARE NAVIGATOR, LLC

                                   Jeff Kaplan
                                   "BCAS"

                                   Lindsay Simon
                                   "BANKRUPTCY PROF"

                                   Ryan Martin
                                   "CCM"

                                   Deanne Graham, *Pro Se*

                                   James Morrison, *Pro Se*

                                   Julie Gutzmann, *Pro Se*

                                   Ray Mulry, *Pro Se*

                                   Ryan Lin, *Pro Se*

                                   Sheryl Wolf, *Pro Se*

                                   Becky Yerak
                                   WALL STREET JOURNAL

                                   Daniel Gill
                                   BLOOMBERG LAW

                                   Jason DiBattista
                                   LEVFIN INSIGHTS

                                   Jessica Steinhagen
                                   REORG RESEARCH

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:                 Maria Chutchian
                                REUTERS

                                Richard Archer
                                LAW 360

                                Taylor Harrison
                                DEBTWIRE

INDEX

                                                                Page

COURT DECISION                                                    7

1          (Proceedings commence at 3:30 p.m.)

2                THE COURT:  Good morning, everyone.  This is Judge

3      Owens.  This is the time that we are gathered to hear the

4      ruling in Gulf Coast.

5                Before I begin, I guess I ask the parties:  Is

6      there anything we need to take are of ahead of time?

7                THE COURT:  Okay.

8                UNIDENTIFIED:  Nothing from the debtors, Your

9      Honor.

10               THE COURT:  Okay.  Great.

11               Okay.  As I mentioned, we're here on the Court's

12     ruling on confirmation of the debtors' plan, as modified,

13     found at Docket Number 1217.

14               The confirmation proceedings lasted four days; and,

15     during such time, the Court heard credible and competent

16     testimony from Mr. Jones, the debtors' Chief Restructuring

17     Officer, as well as Mr. Vogel, the debtor's independent

18     manager; Mr. Chermayeff, a representative of Barrow Street

19     Capital, and Ms. Kjontvedt, on behalf of Epiq, the debtors'

20     administrative advisor, assisting the debtors with, among

21     other things, tabulating the votes cast on the plan.

22               In addition, approximately 91 exhibits were

23     admitted into the record by the parties and considered by the

24     Court.

25               And finally, there was voluminous briefing on the

1  contested confirmation issues filed by interested parties and

2  extensive argument was had.

3      The plan embodies a settlement between the debtors

4  and their key stakeholders; namely, the committee, Omega, and

5  certain affiliates and insiders known as the "contribution

6  parties, that was reached following the parties' voluntary

7  agreement to mediate with former Judge Peck.  It provides for

8  an aggregate guaranteed minimum recovery of at least $10

9  million to holders of general unsecured claims in Class 7.A

10  and litigation claimants, mostly PLGL plaintiffs, in Class

11  7.B.

12      Following further discussions among the parties

13  during the confirmation proceedings, the minimum guarantee

14  was increased to 11.5 million, with the additional 11 point -

15  excuse me --  with the additional 1.5 million earmarked for

16  Class 7.B, to ensure equality of distribution among that

17  subclass following the assumption of several settlement

18  agreements.

19      Additional future amounts may flow to the estates

20  for distributions for unsecured creditors following the

21  liquidation of certain business interruption and D&O

22  insurance policies.

23      Mr. Jones testified that, as a result of the

24  guaranteed funds, claim waivers, and redirection of proceeds

25  agreed to by Omega and the contribution parties, allowed

1   claims of creditors in Class 7.A are projected to receive a

2   recovery of approximately 19 percent, with those in 7.B to

3   receive approximately 21 percent.

4          Mr. Jones further explained that these projected

5   recoveries for unsecured creditors would not be available

6   absent the voluntary contributions of Omega and the

7   contribution parties.

8          Specifically, New Ark, the service providers, and

9   the equity sponsors, collectively known as the "contribution

10  parties," have agreed to contribute 14.75 million in cash to

11  fund a certain amount of allowed professional fee claims and

12  the guaranteed minimum to unsecured creditors.

13         New Ark has also agreed to redirect any recoveries

14  that it is to receive on account of its Section 507(b)

15  priority claim arising from the debtors' use of its cash

16  collateral during the Chapter 11 cases, as well as certain

17  recoveries it's to receive on account of its secured pre-

18  petition claim.

19         Moreover, the service providers agree to waive

20  recoveries on account of their pre-petition claims.

21         Omega has agreed to 1 million for allowed

22  professional fee claims and up to 1 million of business

23  interruption insurance proceeds, if obtained, for the

24  unsecured creditors.  It has also agreed to waive repayment

25  of its DIP financing claim and redirect any recoveries that

1      it's to receive on account of pre- and post-petition claims

2      for the benefit of the unsecured claimants.

3              In toto, the debtors estimate that Omega and the

4      contribution parties have contributed to the plan up to 16.7

5      million of new money, a waiver of approximately 48 million of

6      post-petition DIP, administrative, and priority claims that

7      arose when all the parties knew they would never be repaid,

8      and a waiver or redirection of 124 million of pre-petition

9      claims.

10             Without the agreements to redirect proceeds and

11     waive claims, the debtors' current Class 7 unsecured

12     creditors would be substantially diluted and would only share

13     in approximately 31 percent of the funds available to

14     unsecured creditors in a non-consensual Chapter 11 scenario.

15     Under the current plan, they receive a 100 percent of the

16     guaranteed amount.

17             The unrebutted evidence also indicates that the

18     debtors have little to no available assets with which to fund

19     a plan or a Chapter 7 liquidation, save for potential causes

20     of action stemming from certain insider or affiliate

21     transactions with some of the contribution parties.  As a

22     result of the limited assets and significant amount of claims

23     projected to be allowed against the estates, Mr. Jones

24     testified that the debtors would need to obtain somewhere

25     north of 175 million in litigation proceeds on those causes

1    of action to guarantee the plan's projected minimum recovery

2    to unsecured creditors; 75 million would need to be obtained

3    just to permit any recovery to unsecured creditors in a

4    Chapter 7 scenario.

5        The need for and benefits of the current plan

6    settlement is explained and supported by, among other things,

7    the hypothetical Chapter 7 waterfalls prepared by Mr. Jones

8    and his team as material information was garnered.  Those are

9    found at Debtor Exhibits 19 and 20.  The waterfall and the

10   assumptions underlying it have not been meaningfully

11   challenged.

12       In return for and as a condition to their plan

13   contributions, Omega and the contribution parties have

14   demanded releases for themselves and certain related parties

15   from the debtors, as well as non-consensual releases from the

16   litigation creditors in Class 7.B.

17       Also included in the plan's definition of "third-

18   party released parties" are all the PLGL codefendants and

19   their related parties, which would capture certain former

20   debtor employees and current and former officers.  Pursuant

21   to the plan, creditors who vote in favor of the plan are also

22   giving a release of third-party released parties, but that

23   release is consensual.

24       The plan termsheet found at Debtors' Exhibit 17,

25   executed by the debtors, the creditors' committee, Omega, and

the contribution parties, following their successful

mediation, memorializes the parties' terms, including the

demand for and requirement of the plan's non-consensual

third-party releases.

The Court also heard testimony from Mr. Chermayeff

as to why Barrow Street wants the releases for itself and its

related parties, and why it conditions its plan contributions

on their inclusion in the plan; namely, they wish to buy

peace and finality, a position the debtors' representatives

believe New Ark, the service providers, and all of their

related parties take, as well.

In agreeing to the releases, Mr. Vogel, the

debtors' independent manager, with the sole authority to

pursue, settle, and release the debtors' causes of action,

testified credibly that he believed that it was in the best

interests of the debtors' estates, fair and reasonable to do

so because the releases are a necessary inducement for the

plan contributions of Omega and the contribution parties,

without which the current plan could not be proposed, and

without which unsecured creditors would receive no

distribution.

Supporting that conclusion was Mr. Vogel's

understanding of the nature and value of the debtors' assets

available to fund creditor recoveries; namely, the affiliate

and insider causes of action and the amount and priority of

1    claims, as set forth in Mr. Jones' waterfall scenarios.

2            To gain an understanding of the affiliate and

3    insider causes of action, Mr. Vogel led and controlled an

4    investigation into the estate's causes of action related to

5    the affiliate and insider transactions.  The investigation

6    was independent, sufficient in scope, and conducted by able

7    and experienced professionals.  No real challenge has been

8    made to these conclusions.  The investigation yielded a

9    report that concluded that, at best, the causes of action

10   would yield approximately 64.3 million for the estates.

11           While the objecting parties attempted to discredit

12   some of the conclusions in the investigation report,

13   including the ultimate recovery conclusions, they neither

14   shared with the Court the results of their own investigation,

15   if one was undertaken, nor offered their own valuation

16   conclusions and analysis.

17           Moreover, their targeted challenges to the report

18   failed to seriously impact the material conclusion reached by

19   Mr. Vogel that led to his decision to enter into the plan

20   settlement, that the plan's guaranteed distribution to

21   unsecured creditors resulting from the contributions of the

22   released parties will likely yield far better recoveries to

23   creditors than those that could be achieved absent the plan

24   settlement.

25           Again, the waterfall indicates that 175 million of

litigation proceeds, approximately 2.8 times more than the

debtors' high value estimate, would need to be obtained to

yield the same result as the plan.  And even if there was

credible evidence that 175 million could be obtained in

litigation, which there isn't, the Court cannot discount the

risk of that litigation, the likelihood of recovery against

the defendants, and the time value of money, all additional

considerations of Mr. Vogel in reaching his decision to

approve the plan settlement on behalf of the debtors.

       Mr. Jones also offered his support for the plan for

the same reasons as Mr. Vogel.  Moreover, in support of the

plan, the committee filed a statement, representing that it

conducted its own investigation into potential estate claims

and causes of action, including those that may exist against

the contributing parties.  Like Mr. Vogel, the committee used

the results of this investigation, as well as Mr. Jones'

waterfall, to negotiate with the Omega --  with Omega and the

contribution parties, and agreed to the proposed plan.

       For similar reasons as the debtors, the committee

concluded that the settlement and its guarantee to unsecured

creditors is the best possible outcome for creditors under

the circumstances.

       With respect to the six voting classes of impaired

claims, all but Class 7.B, the litigation claimants, and

those subject to the non-consensual third-party releases

1    voted to accept the plan.

2         While the debtors maintain that Class 7.B accepted

3    the plan, I find that the second ballot cast by Millenia

4    after the voting deadline, which tilted the subclass' vote in

5    favor of the plan, was inappropriately accepted by the

6    debtors, pursuant to the disclosure statement order.

7    Millenia cast its first ballot, which rejected the plan,

8    shortly before the voting deadline.  It has been asserted,

9    but not proven, that Millenia then realized that it submitted

10   its ballot in error as rejecting, when it really wished to

11   accept.  Millenia then sent a second ballot, this time

12   accepting, within two hours after the voting deadline.

13        The debtors agreed to, quote, "waive" the voting

14   deadline and accept that second ballot.  Ms. Kjontvedt

15   testified that there were no defects or irregularities with

16   respect to Millenia's first ballot, but that she accepted the

17   late-filed second ballot after consulting the debtors and

18   reviewing Paragraph 28 of the disclosure statement order.

19        Regardless of Ms. Kjontvedt's belief that accepting

20   Millenia's ballot was appropriate, the terms of the

21   disclosure statement order do not allow its acceptance.  The

22   parties' arguments on this topic were confined to the

23   application of Paragraphs 22 and 28 through 30 of the

24   disclosure statement order.

25        The facts of the Millenia changed vote do not fit

1  into the circumstances described in Paragraphs 29 or 30 of

2  the order because Millenia's vote was not withdrawn, which is

3  Paragraph 29, and the second ballot changing Millenia's vote

4  was not cast before the voting deadline, and there's no

5  evidence suggesting that the voting deadline was extended for

6  Millenia, let alone prior to its expiration, which would

7  cover Paragraphs 22 and 30.

8         Moreover, Paragraph 28 does not apply because Ms.

9  Kjontvedt testified in her capacity as a professional, with

10  extensive experience with vote tabulation, that the original

11  Millenia ballot did not contain any defects or irregularities

12  for the debtors to waive.

13         Accordingly, with Millenia's accepted vote removed,

14  54 Class 7.B creditors voted to reject the plan and 53 voted

15  to accept, resulting in a 50.74 rejecting percentage.

16         Fifty-two of the fifty-four rejecting creditors

17  filed objections to the plan that were still extant at the

18  closing of the confirmation proceedings.

19         In addition, the Office of the United States

20  Trustee objected to confirmation of the plan.

21         All objecting parties object to the inclusion of

22  the non-consensual third-party releases, with the litigation

23  creditors focusing mainly on those to be granted in favor of

24  the insider affiliate contribution parties.

25         In addition, the litigation creditors object to the

1    debtors' release of those parties, the plan's Class 7

2    subclassification of unsecured creditors, the debtors'

3    allocation of the settlement proceeds between the subclasses,

4    the debtors' best interests test analysis, the good faith of

5    the debtors in proposing the plan, the proposed litigation

6    claims procedures, and the original identity of the

7    litigation claimants trustee.  Excuse me.

8            In addition to the inclusion of the non-consensual

9    third-party releases, the U.S. Trustee also raised limited

10   objections to a number of specific plan provisions.  All but

11   one of those were consensually resolved by the parties

12   following the close of the confirmation proceedings.

13           After considering the evidence and legal position

14   of the parties, I have determined that the debtors have not

15   met their burden necessary to confirm the plan with non-

16   consensual third-party releases.  My decision was not easily

17   reached, but it is one that the law requires.

18           The contributions of Omega and the contribution

19   parties, either on behalf of themselves or other related

20   release parties, are substantial, and have enabled a recovery

21   to unsecured creditors when one otherwise would not exist,

22   and those enabling contributions are conditioned on the grant

23   of releases embodied in the plan.

24           The evidence presented was also sufficient to show

25   that the settlement embodied in the plan was achieved during

1    arm's length, good faith negotiations among the debtors, the

2    committee, Omega, and the contribution parties, and that the

3    debtors' decision to enter into the settlement was the result

4    of reasonable and appropriate business judgment, based on an

5    independent, full and fair investigation into the settled

6    debtor claims and appropriate waterfall analysis, which was

7    updated regularly as material information came to light, and

8    the consideration of other relevant facts and circumstances

9    that support a firm settlement with the litigation targets

10   today.

11           However, while those conclusions lend support for

12   the Court's approval of the debtors' releases of their claims

13   against the nondebtors, they cannot, by themselves, support

14   approval of the non-consensual third-party releases.

15           These types of releases are not broadly sanctioned.

16   They require satisfaction of, quote, "exacting standards" set

17   forth by the Third Circuit in Continental.  Those standards

18   require that the Court conclude, based on specific supportive

19   factual findings, that the non-consensual third-party

20   releases are not only necessary to the success of the

21   debtors' reorganization, but also fair to the releasing

22   creditors and given to them in exchange for reasonable

23   consideration.  Here, critical factors that courts in this

24   circuit traditionally rely on to conclude that a plan's

25   inclusion of non-consensual third-party releases is

1    appropriate are missing.

2              At the outset, I'll note that, while the parties

3    did not focus their presentations on the propriety of the

4    third-party releases granted to Omega, the D&Os, and the

5    employees, many or all of the factors that I will discuss

6    with respect to the contribution parties are also missing

7    with respect to the other released parties.

8              For instance, Omega is making a substantial

9    contribution to the plan, but nothing else in the record

10   supports the receipt of non-consensual third-party releases.

11   There is no record supporting the third-party release of the

12   debtors' former employees.  And debtors admit that all

13   parties are willing to remove them and continue with the

14   proposed plan.  While the D&Os may meet some of the criteria

15   necessary to justify their inclusion as non-consensual

16   released parties, such as identity of interest, no evidence

17   was introduced in support.

18             So, with respect to the contribution parties,

19   first, the debtors do not share an indication of interest

20   with the released parties.

21             Moreover, the debtors did not file these cases due

22   to the PLGL litigation sought to be permanently enjoined.

23   There is no evidence suggesting that the PLGL codefendants

24   and any other relevant released party will be unable to

25   defend themselves in that litigation, unable to satisfy

judgments against them if obtained, or could look to the

debtors' estates for indemnification, contribution, or the

like.  The only justification for the release is the desire

by the contribution parties to achieve peace and finality in

exchange for their contributions to the plan.  While I

appreciate and understand that desire, it is not a sufficient

basis to justify a release of the third-party claims, given

the totality of the circumstances.

Moreover, while the debtors cite to cases for the

proposition that parties may share an indication of interest

simply by possessing a common goal of confirming a plan and

consummating the transactions embodied therein, those cases

are a slim minority and I disagree with them.  If that were

the indication of interest test, every plan in which a debtor

advocates for the inclusion of non-consensual releases on

behalf of a third party could satisfy the test.  Moreover,

I'm puzzled as to the relevancy of a shared common goal to

Continental's required questions of necessity and fairness.

Additionally, and perhaps more critically, the

affected PLGL plaintiffs in Class 7.B have not overwhelming

voted to accept the settlement and release of their claims as

embodied in the plan.  As courts have acknowledged, this is

often the best evidence of fairness of a plan's third-party

release to releasing parties.

Support is commonly garnered through negotiation

with the affected creditors or a representative body.  But

here, the litigation creditors had no voice in the plan

settlement process or the allocation of the contributed

funds, either directly or through a seat on the committee.

Moreover, while their projected recovery under the

plan is more than what they would be entitled to a Chapter 7,

the releasing creditors are receiving nowhere close to

payment in full.  And at worst, the evidence suggests that

Class B --  7.B creditors are not receiving anything on

account of the released claims against the third parties by

the released parties.  Rather, the evidence suggests that the

contributions made by the contribution parties were made on

account of the estate's viable causes of action against them.

Indeed, no separate analysis was performed by the

debtors or the committee as to the value of the third-party

released claims at the time the settlement was achieved.  And

as will be explained, the debtors, with the support of the

all trade committee, worked to allocate the guaranteed

amount, so that creditors in Class 7.A, with likely no

pending third-party claims, and those in in 7.B with third-

party claims, would receive the same or close to the same pro

rata distribution of the plan's guaranteed funds.  No other

evidence has been provided by the debtors to suggest a

valuation of the third-party PLGL claims or to explain how

any of the guaranteed amount to be distributed under the plan

1    is on account of those claims.

2         The debtors argue that the third-party claims

3    against the contribution parties are derivative in nature

4    and, thus, are to be released under the release the estates

5    are granting to the contributing parties.  As such, they

6    argue that the third-party claims have *de minimis* value and

7    should not be entitled to disturb plan settlement.

8         The direct derivative issue is complex, not

9    appropriately and fully briefed, and concurrent --  and

10   currently is undecided.  The creditors vigorously dispute the

11   debtors' positions from a legal standpoint and also highlight

12   the debtors' own earlier attempt during these cases to extend

13   the stay to the PLGL lawsuits as not estate claims and the

14   debtors' pre-petition history of sharing the defense of the

15   PLGL lawsuits in State Court with the relevant contribution

16   party codefendants.  These facts certainly confuse the issue

17   even further.

18        As made clear by the Circuit in Continental, third-

19   party releasing creditors must receive consideration on

20   account of the third-party released claims they are forced to

21   give up under a debtor's plan, and it is insufficient for

22   them to receive as consideration only a distribution on

23   account of their claims against the debtor.

24        It is the debtors' burden to establish necessity

25   and fairness, and they have not done so here.  As explained

1    by the Third Circuit in its Millennium Lab decision, in

2    rendering a decision on a request to include non-consensual

3    third-party releases in a plan, I must exercise caution and

4    diligence and am obligated to approach their inclusion with

5    the utmost care.  I have done so, and I am unable to conclude

6    that there is sufficient justification for the non-consensual

7    third-party releases proposed in the plan.  Excuse me.

8         While the debtors believe that the plan as proposed

9    cannot go forward without the non-consensual third-party

10   releases, I'll briefly address the remaining issues.

11        The litigation claimants object to the debtors'

12   release of, among others, the contribution parties.  As

13   explained by Judge Carey in his 2010 Spansion decision,

14   courts may approve such releases after considering the facts

15   and equities of each case.

16        Section 1123(b)(3)(A) permits debtors to release

17   estate claims against nondebtor third parties if the release

18   is a valid exercise of the debtor's business judgment, is

19   fair, reasonable, and in the best interest of the estate.

20   While a court can use the five Master Mortgage factors as a

21   guidepost to make that determination, all need not be present

22   for a court to approve a proposed release, and they are not

23   the exclusive set of factors a court may consider in reaching

24   a decision.

25        For the reasons already described, the debtors'

1    agreement to release the nondebtor parties outlined in the

2    plan is fair, reasonable, and in the best interest of the

3    estates and is a valid exercise of their business judgment.

4         Moreover, the committee, serving as estate

5    fiduciary, supports the releases, and five of the six voting

6    classes voted overwhelmingly in favor of the plan, including

7    the debtors' releases contained therein.  That is

8    unsurprising, since the plan as proposed is the only pathway

9    for a recovery to unsecured creditors and provides a home

10   run, value-maximizing transaction on account of the debtors'

11   assets in exchange for the releases, thus achieving

12   recoveries for unsecured creditors beyond what they could

13   expect in both a Chapter 7 liquidation and a non-consensual

14   Chapter 11 plan scenario.

15        The litigation creditors assert that the debtors

16   have not sufficiently satisfied the best interests test of

17   Section 1129(a)(7) because the analysis excludes the value of

18   third-party claims proposed to be non-consensually released

19   under the plan.  The Court is not approving those releases.

20   But even if it was, I disagree that a valuation of released

21   third-party claims asserted against nondebtors is required

22   under the best interests test.

23        Persuasive case law, including Judge Drain's

24   decision in Purdue Pharma, explains why the plain language of

25   the Code does not require it.  The Code mandates a comparison

between the amount objecting creditors would receive under

the plan on account of their claims against the debtors and

what they would receive on account of such claims if the

debtor were liquidated in a Chapter 7.  That conclusion is

also supported by the Delaware District Court in its 2012

W.R. Grace decision.

The litigation creditors argue that the plan

improperly separates the Class 7 unsecured claims into two

subclasses.  Classification of similar claims or interests

must be reasonable to satisfy Sections 1129(a)(1) and 1122.

The evidence shows that the debtors separately classified the

Class 7.A and 7.B claims to enable quicker distributions to

those creditors in Class 7.A who have mostly asserted

liquidated, undisputed claims, unlike a sizeable portion of

the litigation claimants in Class 7.B.  The 7.B claims would

complicate and delay distributions to Class 7.A claimants if

the classes were combined because 7.B claims will need to be

reconciled and may be estimated.

Moreover, the record reflects that the claimants

placed in 7.B are those with third-party claims subject to

the proposed non-consensual releases.  Placing them in a

subclass made it easier to narrow and identify the affected

creditors and I think, most importantly to the classification

analysis, gave them a voice in the proceeding.

If Class 7.B claimants were lumped with Class 7.A

1    creditors into one divided Class 7, it is undisputed that the

2    litigation creditors rejecting the plan would be diluted by a

3    large number of accepting voters that would carry the

4    undivided class.  As such, it was reasonable and appropriate

5    for the debtors to place the 7.B claimants into their own

6    class and give them a separate voice in these proceedings.

7         Several objecting parties point out a *de minimis*

8    number of creditors who may have been misclassified between

9    Classes 7.A and 7.B.  But any misclassification did not cause

10   any harm because the Class 7.B creditors rejected the plan.

11        Class 7.B has voted to reject the plan.

12   Accordingly, Section 1129(a)(8) has not been satisfied and

13   the debtors must show that the plan does not unfairly

14   discriminate and it's fair and equitable with respect to

15   Class 7.B.

16        The litigation creditors argue that the plan

17   unfairly discriminates between them and the equal priority

18   creditors of Class 7.A because the allocation of the

19   guaranteed funds for distribution to unsecured creditors was

20   done incorrectly and will result in Class 7.B receiving a

21   lower percentage recovery from the estates on account of

22   their allowed claims than those similarly situated in Class

23   7.A.

24        Moreover, they argue that creditors in Class 7.A

25   were given the opportunity to avoid the third-party releases,

1    whereas they were not.  The latter point is moot given my

2    ruling today on the releases.

3        Mr. Jones' testimony reflects that, after the

4    settlement was reached and the guaranteed minimum was

5    earmarked for unsecured creditors, the debtors undertook a

6    process of reconciling the asserted unsecured claims to

7    determine a projected aggregate of likely allowed claims in

8    each Class 7 subclass to divide sufficient funds between the

9    subclasses, so that each Class 7 creditor would receive the

10   same pro rata recovery.  Debtors' Exhibit 21 reflects the

11   ultimate result of that exercise with 63 percent of the

12   guaranteed minimum allocated to Class 7.A and the remaining

13   37 percent to Class B.

14       With respect to litigation claims in 7.B that are

15   disputed and unliquidated, Mr. Jones and his team, with the

16   assistance of personnel from HCN who have historically

17   overseen the debtors' claim and litigation matters, and thus

18   possess relevant knowledge regarding the subject claims,

19   analyzed the historical five-year settlement history and

20   other various factors they determined to be key markers of

21   settlement value to determine ranges of likely claim

22   recoveries.  Prior judgment amounts were unavailable to

23   consider because none exist.

24       The desire and approach taken by the debtors to

25   divide the funds to ensure an equal pro rata recovery to all

1    unsecured creditors is commendable.  However, for reasons

2    explored by the litigation creditors during the confirmation

3    proceedings, there is a likely chance that the debtors'

4    estimates of the total claims pool of Class 7.B will be

5    incorrect and that the percentage recoveries to allowed

6    claimants in that class will be lower than 7.A.

7            The magnitude of any such disparity, however, is

8    unknown.  The estimate of aggregate 7.B claim amounts ranges

9    from the debtors' high estimate of 24.1 million to

10   approximately forty-eight --  488.7 million, representing the

11   aggregate of scheduled claims and asserted proofs of claim

12   that have not been objected to or estimated.

13           Nonetheless, even if the magnitude was sufficient

14   shown to be material, the discrimination would not rise to a

15   level --  to an unfair level.  The recoveries to creditors in

16   this case result from contributions of third parties.  Absent

17   the contributions of Omega and the contribution parties,

18   Class 7.B creditors would receive no recoveries on account of

19   their claims.  Accordingly, as explained by the Exide,

20   Nuverra, and Genesis Health decisions, any presumption of

21   unfairness as a result of possible material unequal

22   recoveries between creditors in Class 7.A and 7.B would be

23   rebutted.

24           In determining when a plan is proposed in good

25   faith, courts consider the totality of circumstances,

1  focusing more on the process of plan development than to the

2  context of the plan.  Good faith is shown when the plan has

3  been proposed for the purpose of reorganizing the debtor,

4  preserving the value of the estate, and delivering that value

5  to creditors.

6        On the other hand, good faith has been found to be

7  lacking if the plan is proposed with ulterior motives.  While

8  some of the objecting litigation creditors have argued that

9  the debtors lacked good faith in proposing the plan, that

10  objection is not sustainable given the facts adduced at trial

11  underlying the process undertaken to value estate causes of

12  action, analyze possible pathways to creditor recovery,

13  engage in substantive negotiations with key stakeholders

14  regarding a plan settlement with the assistance of an

15  experienced judicial mediator, all while facing extreme

16  liquidity constraints, and continuing to refine the

17  settlement and augment recoveries to unsecured creditors

18  embodied in the plan throughout the confirmation proceedings.

19        Circumstantial evidence relied upon by the

20  objecting parties to support an argument of bad faith,

21  including possible problems with the subclassification of

22  certain Class 7 claims, the Class 7.B vote tabulation, and

23  the assumption of certain 7.B settlements, is not

24  sufficiently persuasive to contradict the Court's conclusion

25  that the debtors acted in good faith when proposing the plan.

1          As related by the parties yesterday via joint email

2     to the Court, all but one of the remaining objections raised

3     by the U.S. Trustee in its formal objection had been

4     resolved.

5          The open objection relates to the debtors' request

6     in Article X(5) -- or excuse me --  10(f) to serve as the

7     exclusive gatekeeper post-confirmation with respect to

8     released claims.  In particular, the debtors had requested

9     that I retain sole and exclusive authority to determine

10    whether a claim or cause of action against a released party

11    arises from or is related to a debtor-released claim or a

12    third-party released claim and, in doing so, authorize such

13    party to bring the claim against the relevant release party.

14         I will sustain the U.S. Trustee's objection on this

15    point.  I see no reason to retain exclusive jurisdiction for

16    a determination that has been requested of me.  The

17    confirmation order says what it says, and the other courts

18    should be entitled to -- or excuse me --  the plan says what

19    it says, and other courts should be entitled to exercise

20    their authority to interpret it.

21         Imposing such a requirement could also impose an

22    unnecessary administrative hurdle and cost the parties when

23    these cases are closed.

24         That takes us to the last objection regarding the

25    trust procedures and trustee identification.  The litigation

1    creditors objected to the debtors' litigation claims

2    procedures and the identity of the litigation clams trustee,

3    as set forth in the plan supplement.  The debtors wish to

4    resolve the objections with the litigation claimants.

5         Given that it's unclear whether the plan will move

6    forward in these cases; and, if so, what form it will take, I

7    will not address these issues as they are not ripe.

8         For similar reasons, the Court --  myself --  has

9    not reviewed the debtors' revised proposed confirmation

10   order, but will do so, if appropriate, at a future time.

11        To the extent that the parties raise other

12   objections to confirmation of the plan that I have not

13   specifically addressed, they are overruled.

14        The plan, the evidence adduced in favor of

15   confirmation and the legal briefing support the conclusion

16   that the debtors have met all other confirmation requirements

17   of the Code, including those of Section 1122, 1123, and 1129,

18   and would be entitled to approval of their plan absent the

19   non-consensual third-party releases.

20        Thank you for enduring that lengthy oral ruling.  I

21   know that this is a lot of information for the parties to

22   process, and you may not have an understanding of how you

23   wish to move forward.  I guess I would suggest to the

24   parties, if they would like it, I'm happy to put a date on

25   the calendar in the near future for a status conference, or

1    you could reach out to my chambers and let me know whether

2    that would be something that the parties are interested in

3    doing.

4              MR. SIMON:  Thank you, Your Honor.

5              THE COURT:  Mr. Simon.

6              MR. SIMON:  Thank you, Your Honor.  Obviously it's

7    a lot to digest.  So perhaps we should convene with the

8    parties and come back to you as --  in connection with next

9    steps, and we'll reach out accordingly.

10             THE COURT:  Okay.  I have some time next week, so,

11   if you want to save any of that time or reserve any of that

12   time --

13             MR. SIMON:  Sure.

14             THE COURT:  -- just email Ms. Lopez and she will

15   get it on the calendar.

16             MR. SIMON:  Okay.

17             THE COURT:  Okay.

18             MR. SIMON:  Thank you, Your Honor.  We appreciate

19   that.

20             THE COURT:  All right.  Thank you all very much.

21   And I apologize, for some reason, my throat was acting up the

22   moment I took the bench today.  So, hopefully, you were able

23   to hear and understand that ruling.

24             And unless there's anything further, we will

25   adjourn for the day.

33

1          Mr. McNeill, I see that you're on the line.  Is

2    there anything that we need to talk about?

3          MR. MCNEILL:  No, Your Honor.  I just was putting

4    my face on the screen to thank Your Honor for your ruling.

5          THE COURT:  Okay.  Thank you, all, very much.  I

6    look forward to hearing from you all in the near future.  We

7    can consider this hearing adjourned.  Take care.  Have a good

8    night.

9          COUNSEL:  Thank you, Your Honor.  Thank you.

10          (Proceedings concluded at 4:04 p.m.)

11                              *****

34

1                           CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10

11   _____        May 4, 2022

12   Coleen Rand, AAERT Cert. No. 341

13   Certified Court Transcriptionist

14   For Reliable

## **CERTIFICATE OF SERVICE**

I, Hannah McCollum, hereby certify that on October 3, 2025, I caused to be served a copy of this Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were sent via email to parties in interest.


Dated: October 3, 2025                    */s/ Hannah McCollum*
                                          Hannah McCollum