IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | | |
|---|---|---|---|
| IN RE: FORMER BL STORES, INC. *f/k/a* BIG LOTS INC., *et al.,* | | : | Chapter 7 |
| | Debtors. | : | Bankr. No. 24-11967-JKS |
| | | : | |
| PEAK LIVING, INC., *et al.,* | | : | |
| | Appellants, | : | Civ. No. 25-72-GBW |
| v. | | : | |
| | | : | |
| BIG LOTS, INC., *et al.,* | | : | |
| | Appellees. | : | |
| PRESTIGE PATIO, INC., | | : | |
| | Appellant, | : | Civ. No. 25-78-GBW |
| v. | | : | |
| | | : | |
| BIG LOTS, INC., *et al.,* | | : | |
| | Appellees. | : | |
| HELLO SOFA, LLC, *et al.,* | | : | |
| | Appellants, | : | Civ. No. 25-130-GBW |
| v. | | : | |
| | | : | |
| BIG LOTS, INC., *et al.,* | | : | |
| | Appellees. | : | |

## <u>OPINION</u>

Maria Aprile Sawczuk, GOLDSTEIN & MCCLINTOCK LLLP, Wilmington, DE; Danielle Mashburn-Myrick, PHELPS DUNBAR LLP, Mobile, AL; Richard E. Schrier, SCHRIERSHAYNE P.C., New York, NY – Counsel to Appellants.

Robert J. Dehney, Sr., Andrew R. Remming, Daniel B. Butz, Sophie Rogers Churchill, Brianna N.V. Turner, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE; Brian M. Resnick, Adam L. Shpeen, James I. McClammy, Stephen D. Piraino, Matthew R. Brock, DAVIS POLK & WARDWELL LLP – Counsel to Appellees.

March 31, 2026
Wilmington, Delaware

**WILLIAMS, U.S. DISTRICT JUDGE:**

These appeals arise in the bankruptcy cases of Former BL Stores, Inc. f/k/a Big Lots, Inc., and certain affiliates (together, the "Debtors") with respect to an order authorizing the sale of substantially all of the Debtors' assets to Gordon Brothers Retail Partners, LLC ("GBRP") pursuant to section 363(b) of the Bankruptcy Code (Bankr. D.I. 1556)[1] (the "Sale Order"), entered on January 2, 2025, for the reasons set forth on the record at a December 31, 2024 hearing (Bankr. D.I. 1554 ("12/31/24 Tr.") at 226-32) (the "Bench Ruling") held on extremely limited notice.

GBRP served as a liquidation consultant prior the Debtors' chapter 11 filing, and the Debtors' agreement with GBRP was assumed postpetition. Notably, on September 8, 2024, months before the sale to GBRP, the Debtors had entered into an asset purchase agreement with another "stalking horse" purchaser also for the sale of substantially all of their assets. That sale was approved on November 11, 2024 following a typical marketing, bidding, and auction process, conducted in accordance with usual notice and hearing requirements. Just prior to the Christmas holiday, however, the purchaser withdrew. The failure of the transaction left the Debtors' 870 locations in limbo, including leases, inventory, and employees, during the busy holiday season. Having failed to close the sale in early December, the Debtors had also missed a milestone required to maintain their debtor-in-possession ("DIP") financing. In default with their post-petition lenders, with the value of their assets rapidly declining, and otherwise facing liquidation, the Debtors sought to find another purchaser; only GBRP emerged from that process. Having been the back-up bidder in the prior sale process, the Debtors were able to negotiate a replacement

---

[1] On November 10, 2025, the Debtors' chapter 11 cases were converted to cases under chapter 7. The docket of the chapter 7 cases, captioned *In re Former BL Stores, Inc.*, No. 24-11967-JKS, is cited herein as "Bankr. D.I. __." It appears that substantially similar briefs were filed in each of the three appeals. For ease of reference, the Court will cite to the docket of Civ. No. 25-72-GBW unless otherwise noted. The appendix (D.I. 24-25) filed in support of the Debtors' answering brief is cited herein as "A__."

1

transaction with GBRP in a short period of time, and sought court approval on an extremely expedited basis. Specifically, the Debtors filed their motion to approve the sale to GBRP on Friday, December 27, seeking shortened notice; ultimately, a hearing was held the following Monday, December 30, continued to December 31, and the sale was approved by the Bench Ruling that day.

Appellants Peak Living, Inc. ("Peak Living"), Delta Furniture Manufacturing, LLC ("Delta"), Independent Furniture Supply Co., Inc. ("IFS"), Prestige Patio ("Prestige"), Hello Sofa, LLC ("Hello Sofa"), and Franklin Corporation ("Franklin") (collectively, "Appellants") sold inventory to the Debtors postpetition, entitling them to administrative expense claims. Appellants objected to the GBRP sale, which, unlike the previously approved sale, did not provide for full payment of postpetition administrative claims of trade vendors like the Appellants. Appellants' administrative expense claims for good shipped to the Debtors postpetition totaled $12,336,427.60, and the sale to GBRP would leave them with a fractional recovery, while other administrative expense claims—including those held by the lenders and professionals retained in the bankruptcy cases—would be paid in full.

The Bankruptcy Court was "confronted with two options," and, as it observed, "[n]either is ideal. The Court either denies or approves the sale. This is not a case where the alternatives are hypothetical." (*Id.* at 226:10-13.) Based on the evidence presented, the Bankruptcy Court ultimately held that the proposed transaction was "the only transaction to maximize value," and "better than the alternative," because "[a]bsent the sale, debtors would pivot [to] a complete liquidation." (*Id.* at 226:14-228:18).

On appeal, Appellants challenge the Sale Order on a number of bases. Appellants further challenge the order (Bankr. D.I. 1449) shortening notice of the hearing on the sale motion, which was filed late in the afternoon on Friday, December 27, 2024, and which gave interested parties

2

"less than 4 business hours' notice" of the sale hearing. Appellants assert that GBRP is not a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, based on its role as liquidating agent and its affiliate's role as one of several of the Debtors' lenders. Appellants further assert that, even if GBRP is a good faith purchaser, the Court need not unwind the underlying sale in order to provide Appellants their requested relief from the Sale Order, and therefore their appeals are not statutorily moot. For the reasons set forth herein, the Court finds no clear error in the good faith finding contained in the Sale Order and concludes that the appeals must be dismissed pursuant to section 363(m) of the Bankruptcy Code.

## I. BACKGROUND

### A. The Debtors and GBRP

The Debtors owned and operated a home discount retailer. In 2022, the Debtors began a process to "right size" their store portfolio and, in conjunction with that effort, on November 30, 2022, the Debtors entered into a Services Agreement with GBRP, as liquidation consultant, to facilitate certain store closings, marketing, markdowns, cadence, and placement of inventory. (*See* A00819-936 ("10/21/24 Tr.") at 20:9-15.) At the time, GBRP was one of three vendors who provided services to the Debtors in connection with store closing sales. (*Id.* at 20:21-21:2.) Of the three, GBRP consistently had the strongest performance. (*Id.* at 21:3-11.)

### B. Secured Financing Transactions

In 2022, the Debtors entered into a $900 million asset-based lending facility (the "ABL") with PNC Bank, National Association ("PNC"), which was subsequently reduced to $800 million. (A00008-9.) The ABL was secured by a first priority lien on the Debtors' working capital assets, such as receivables, inventory, cash and cash equivalents, as well as a second priority lien on non-working capital assets such as fixtures, machinery, equipment, intellectual property, and real estate. (A00009-10.) On April 18, 2024, the Debtors entered into a $150 million term loan

3

facility (the "Term Loan"). (A00009-10.) The administrative agent for the Term Loan was 1903P Loan Agent, LLC ("1903P") (*Id.*) Other lenders under the Term Loan included Tiger Finance LLC and Hilco Merchant Resources (together with PNC and 1903P, the "Secured Lenders"). (10/21/24 Tr. at 25:10-20, 26:7-13.) Of those three lenders, 1903P was an affiliate of GBRP. (A00655.) The term loan was secured by a first priority lien on the Debtors' non-working capital assets and a second priority lien on their working capital assets. (A00009-10.) As of the Petition Date, the Debtors owed $412.0 million under the ABL and $122.5 million under the Term Loan. (*Id.*)

### C. The Bankruptcy Filing

On September 9, 2024, the Debtors filed voluntary petitions for relief under chapter 11. Beginning in June 2024, the Debtors worked with an investment bank to find a buyer for their business and contacted 18 potential purchasers; of those, 12 signed nondisclosure agreements and were given access to confidential information. (A00017, A00649.) Only one prospective purchaser submitted a bid—an affiliate of Nexus Capital Management LP ("Nexus"). (A00649.) The Debtors entered a stalking horse asset purchase agreement with Nexus (the "Stalking Horse Agreement") on September 8, 2024. (A00196.)

The Debtors further sought entry of an order authorizing them to obtain senior secured superiority post-petition financing, which the Court granted (the "DIP Order"). (A00735–819.) Among other things, this order allowed the Debtors to roll the ABL and the Term Loan into post-petition financing facilities. (A00736–38.) In exchange for the provision of postpetition financing, the Debtors agreed to release all claims against the Secured Lenders, subject to a challenge period (the "Challenge Period"). (A00749–50.) Such claims would be released unless a party obtained standing to commence a challenge by November 7, 2024. (A00803.)

### D. Assumption of the Services Agreement with GBRP

The Debtors also sought permission to assume the Services Agreement with GBRP to

4

assist with several hundred store closing sales during their restructuring. (A00045–194 (the "Service Agreement Motion"); A00840 at 22:3-18.) The United States Trustee ("UST") objected on the basis that GBRP had a "disqualifying conflict of interest" as an affiliate of 1903P, one of the Secured Lenders. (A00657–75.) The UST argued that "[t]he two-or-three-hat-role which [GBRP] and its syndicate partners seek in these cases is not indicative of good faith." (A00673.)

The Bankruptcy Court held a contested hearing on October 21, 2024. At the hearing, the Debtors' CFO, Jonathan Ramsden, testified that GBRP's role was limited to advising the Debtors on aspects of store closing sales. (10/21/24 Tr. at 20:7-15.) Mr. Ramsden testified that the Debtors were seeking to assume the Services Agreement, in part, because GBRP had the strongest performance out of all their liquidation consultants. (*Id.* at 21:3-21.) While the Debtors had agreed to use GBRP as a liquidation consultant under the terms of the Term Loan, Mr. Ramsden testified that the Debtors did not have any concerns about entering that agreement because of GBRP's strong performance to date. (*Id.* at 21:15-21.) Mr. Ramsden further testified that, in GBRP's limited role, it did not advise the Debtors with respect to their general chapter 11 strategy. (*Id.* at 22:19-23:12.) Moreover, for the store closing sales on which GBRP consulted, Mr. Ramsden testified that GBRP did not have the authority to make any final decisions as such authority rested with the Debtors. (*Id.* at 23:23-24:19.) He further testified that GBRP did not have any input as to exercising rights under the Term Loan. (*Id.* at 26:14-17.)

Following the contested hearing, the Bankruptcy Court approved the Debtors' assumption of the Services Agreement. The Bankruptcy Court found that

> [t]he debtors make all decisions on which stores to close and what assets to liquidate. Although the debtors collaborate with GBRP, the [D]ebtors, through their merchandising plan team, ultimately decide . . . the cadence of pricing, the movement of inventory, and all other aspects governing the GOB sale. GBRP is not involved in negotiating the terms of a plan.

5

(*Id.* at 116:6-12.) The Bankruptcy Court also found that "GBRP has no involvement in the administration of the debtor's estate." (*Id.* at 116:23-25.) Based on these facts, the Bankruptcy Court entered an order finding that GBRP "is not an insider of the Debtors." (A00679 at ¶ H.)

### E. The Committee's Investigation of Potential Claims and the Court's Approval of a Sale to Nexus

The Debtors obtained an order establishing bidding procedures, which allowed other potential purchasers to bid against Nexus on the Debtors' assets. (A00937–1000.) Pursuant to that order, an open auction for the sale of the Debtors' assets was held on October 30, 2024. (A01269 at 76:15-25.) At that auction, the only entity other than Nexus to submit a bid was GBRP. (A01269 at 76:19-25.) However, the Debtors, in consultation with their advisors, Secured Lenders, and the Official Committee of Unsecured Creditors (the "Committee") determined that GBRP's bid did not constitute a qualified bid under the bidding procedures order. (A01269 at 76:19-25.) Specifically, the Debtors determined that GBRP's bid was not higher or better than Nexus's stalking horse bid. (A01270 at 77:1-3.) Accordingly, the Debtors rejected GBRP's bid and selected Nexus as the winning bidder. (A01270 at 77:5-14.) Under the asset purchase agreement (Bankr. D.I. 1232-1) (the "Nexus APA"). Nexus agreed to: (i) repay the ABL and the Term Loan; (ii) pay an additional $2.5 million into the Debtors' estate; and (iii) fund certain assumed liabilities, which included all of the Debtors' post-petition accounts payable (such as Appellants' administrative claims). No party objected to the sale, which was approved after a two-day hearing on November 21 and 22, 2024 (the "Nexus Sale Hearing"). (A01445–49.) The Nexus APA was scheduled to close around December 2, 2024.

Meanwhile, the Committee and a large creditor, Blue Owl Real Estate Capital LLC ("Blue Owl") worked to investigate potential claims against the Debtors' Secured Lenders and GBRP. (*See* A01091–1105; A01106–18.) As part of this investigation, they served eight discovery

6

requests on the Debtors, plus additional requests on the Secured Lenders and GBRP, who collectively produced more than 20,000 documents in response. (A01096–97.) On November 4, 2024, Blue Owl filed a motion to extend the Challenge Period to bring claims against the Secured Lenders. (A01001–22.) Blue Owl stated that it intended to bring claims alleging, among other things, that GBRP and 1903P worked together to "use their stranglehold on the Debtors' business to exercise dominion and control over the Debtors." (A01009–11.) Then, after an initial extension of the Challenge Period, both the Committee and Blue Owl filed another round of emergency motions seeking to extend the Challenge Period on November 18, 2024—three days before the hearing to approve the sale to Nexus. (A01091–105; A01106–18.) In this round of motions, they identified various claims against the Secured Lenders but, after reviewing almost 6,000 documents produced by GBRP in discovery, they no longer asserted claims relating to GBRP. (A01096–97; *see generally* A01091–105; A01106–18.)

The Nexus APA contained a condition precedent to Nexus's obligation to close, requiring that the Debtors satisfy a "minimum asset covenant." (*See* Nexus APA § 9.06.) Prior to December 1, 2024, the Debtors notified Nexus that they would not have inventory sufficient to satisfy the minimum asset covenant. (*See* 12/31/24 Tr. at 14:14-22, 78:19-25.) On December 5, 2024, Nexus advised that it was "exploring whether there [was] a path to close," and cautioned that "there [was] now a significant capital need" to close the sale. (Bankr. D.I. 1437-2 ("Percy Decl.") ¶ 10; 12/19/24 Tr. at 8:7-20; 12/31/24 Tr. at 13:16-24.)

The Debtors' post-petition financing facilities also contained certain milestones. Among other things, if the Debtors did not close on the sale of their assets by December 13, 2024, the Secured Lenders could accelerate the loans and foreclose on the collateral. (A01589; A00440; A00609–11.) When the sale did not close by December 13, the Secured Lenders sent notices of default, but reserved their rights and did not accelerate the loans. (A01589.)

7

On December 14, 2024, Nexus informed the Debtors that the sale likely would not close. (A01589.) On December 19, 2024, the Debtors announced this at a status conference. (Bankr. D.I. 1416) (A01462-1540) ("12/19/24 Tr."). The Debtors acknowledged that the estates might be administratively insolvent. (*Id.* at 26:9-16.) The Bankruptcy Court expressed the view that the Debtors' estate is "a melting ice cube" and encouraged the Debtors to "move expeditiously." (*Id.* at 44:4-11.) The Debtors engaged GBRP to conduct store closing sales in their remaining stores and halted all acquisitions of new merchandise. (A01470; A01486; A01508–09; A01589–90.)

## F.     The GBRP APA

On December 15, 2024, GBRP reached out to the Debtors to renew its offer from the auction to acquire the Debtors' assets. (A01590–91.) The Debtors did not immediately accept this offer, once again soliciting bids for their assets from other parties and contacting "well in excess of 40" potential purchasers. (A02221; A02313.) GBRP was once again the only party to submit a bid. (A02307.) The Debtors continued to negotiate with GBRP and ultimately came to an agreement (the "APA") containing better terms than GBRP's prior offer. (A02224–25.)

Pursuant to the APA, GBRP agreed to (i) repay the Debtors' Secured Lenders, (ii) pay all post-closing administrative expense claims associated with the liquidation of the Debtors' assets, (iii) pay outstanding "stub rent" owed to the Debtors' landlords, and (iv) fund a wind-down budget that would cover certain other expenses. (A01591.) Any administrative expense claims that accrued before closing would be paid from other estate assets, including proceeds from the sale of the Debtors' corporate headquarters—for which GBRP would receive the first $10 million and the Debtors' received the remainder, then valued at $35 million—and any litigation claims the Debtors held, for which they assigned a 40% interest in any proceeds to GBRP. (A02224–25.) In addition, Variety Wholesalers—which was not a party to the APA—would acquire between 200 and 400 of the Debtors' stores as a going concern, along with the Debtors' intellectual property so

8

that those stores could be operated under the Big Lots name. (A01590–91.) Variety offered continued employment to the Debtors' thousands of employees in those stores who, absent the APA, would have all been laid off. (A01590–92.)

**G.      The Order Shortening Notice and the Expedited Sale Hearing**

On Friday, December 27, 2024, the Debtors filed a motion to approve the APA (Bankr. D.I. 1437) (A01541-865) (the "Sale Motion") and a motion to shorten the required notice (Bankr. D.I. 1442) (A01866-76) (the "Motion to Shorten") so that the Sale Motion could be heard on Monday, December 30, 2024 at 11:00 a.m. (the "Sale Hearing"). With respect to the Motion to Shorten, the Debtors noted that—as the Bankruptcy Court stated at the December 19 hearing— their estate was a "melting ice cube" that was hemorrhaging money, and they needed to enter the APA immediately—with GBRP's promise to fund go-forward expenses—in order to stem the losses. (A01871.)  The Bankruptcy Court issued the Order Shortening Notice the same day (Bankr. D.I. 1449) (A01877–78), permitting any objection to the Sale Motion to be made at the hearing and requiring no written objections in advance.

Between December 27 and December 30, the Debtors and the Committee negotiated a settlement to resolve the Committee's sale objections. First, the Debtors agreed to modify the APA so that claims against the Debtors' directors and officers were not transferred to GBRP and could, instead, be pursued for the benefit of the estate. (A02097.) Second, the Debtors sold their preference claims to GBRP, who agreed not to pursue them, benefiting merchandise vendors, like the Appellants. (A02097–98.) Last, AlixPartners agreed to waive a $500,000 payment to which it may have been entitled under the terms of its engagement. (A02098.)

Over the objection of the UST and numerous parties, the Sale Hearing commenced at 11:00 am (ET) on Monday, December 30, 2024. After the Debtors' initial presentation, and argument by the UST and other objectors, the Debtors called Kent Percy, a partner with

9

AlixPartners, to testify. Several trade vendors objected as counsel for many had not been able to communicate with their clients, and none had had time to conduct discovery on the APA or properly prepare for the hearing. In response, the Bankruptcy Court adjourned the Sale Hearing one day to permit Mr. Percy's deposition that night on the evening of December 30, 2024. Mr. Percy's deposition commenced at 7:00 p.m. (ET) on December 30, 2024 and concluded at 10:08 p.m. Forty-eight parties appeared at the deposition. The Sale Hearing recommenced the following morning, December 31, 2024.

Mr. Percy testified as to the benefits of the proposed sale. He testified that AlixPartners prepared a comparison of the funds available to distribute to creditors under the APA versus the funds available to distribute in an orderly liquidation scenario—the best alternative to the sale, as no other bidders had come forward. (A03428.) Mr. Percy explained that, in a sale to GBRP, AlixPartners estimated that the Debtors would distribute $19 million to administrative claimholders like Appellants. (A03428; A02231.) Absent the sale, AlixPartners estimated that the Debtors would, at most, distribute $10.8 million to administrative claimholders and, in a worst case, might not be able to pay their Secured Lenders in full, leaving no recovery for administrative claimholders like Appellants. (A03428; A02231.) Mr. Percy testified that the latest budget filed on December 26, 2024, and approved by the Secured Lenders, assumed the GBRP Sale would close the week of December 30, and Debtors' feared that the Secured Lenders might not give authority to use cash collateral and pay expenses going forward if the GBRP Sale did not close the week of December 30. (12/30/24 Tr. at 26:24-27:5; *id.* at 34:9-14.) The Committee strongly supported the sale, arguing that, based on their investigation, "this transaction does maximize value over any other option that's on the table right now." (A02107-08 at 42:22-43:4.) The Committee further argued that the only other option was liquidation, which it did not view as "value-maximizing." (A02107-08 at 42:22-43:4.)

From Appellants' perspective, the expedited schedule left them with inadequate time to even contact their clients, let alone review the Sale Motion, conduct discovery, participate in the weekend deposition, or prepare for the sale hearing. (*See* D.I. 21 at 15; D.I. 26 at 3-5.)

**H.     The Bench Ruling and the Sale Order**

On December 31, 2024, the Bankruptcy Court read the Bench Ruling into the record. The Bankruptcy Court found that "[n]otice of the sale hearing was good and adequate under the circumstances," observing that "all parties in interest who appeared in court or by Zoom had a full and fair opportunity to present argument and cross-examine the witness" and that "over 40 parties in interest"—including Appellants—"participated in a deposition of the debtors' witness." (Bench Ruling at 225-26.) The Bankruptcy Court also noted that "[t]he debtors worked throughout the weekend with the Committee, lenders, GBRP, and various constituent groups . . . responding to discovery and making witnesses available for deposition." (*Id.* at 226.) The Bankruptcy Court stated that it was "important[]" that "those discussions resulted in changes to the transaction and proposed order for the benefit of the creditors." (*Id.*)

The Bankruptcy Court concluded that, while neither of the two options it was confronted with was ideal, compared to a liquidation—the only available alternative—the sale to GBRP "is the best alternative and the only transaction available to maximize value." (*Id.*) The Bankruptcy Court noted that, "in a six-month process, GBRP was the only party, other than Nexus, that submitted an actionable bid to the debtors prior to the auction" and that while "[n]umerous parties were interested . . . no offer was of the same value of the GBRP offer." (*Id.* at 227.) Accordingly, the Bankruptcy Court concluded that "an additional marketing period would not yield a higher purchase price for the debtors' assets than the purchase price contemplated." (*Id.* at 228.) The Bankruptcy Court further found that "there is no evidence that GBRP did not act in good faith, that its negotiations were not at arm's-length, or that GBRP is not entitled to the protections in

11

Section 363(m)." (*Id.*) In addition, the Bankruptcy Court found that the APA's framework of only guaranteeing payment in full to post-closing administrative expenses was proper because "paying negotiated administrative expenses are necessary to conduct the store-closing process and maximize value for the bankruptcy estate." (*Id.* at 228-29.) The Bankruptcy Court also denied an oral motion to stay the order pending appeal. (*Id.* at 233.) On January 2, 2025, the Bankruptcy Court entered the Sale Order. The sale was not stayed pending these appeals.

## I.    The Appeals

On January 16, 2025, Appellants Peak Living, Delta Furniture, IFS, and Prestige each timely appealed the Sale Order pursuant to Bankruptcy Rule 8002(a)(1). (Civ. No. 25-72-GBW, D.I. 1; Civ. No. 25-78-GBW, D.I. 1.) On January 30, 2025, Appellants Hello Sofa and Franklin filed a timely notice of appeal pursuant to Bankruptcy Rule 8002(a)(3). (Civ. No. 25-130-GBW, D.I. 1.) The appeals are fully briefed. The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.   JURISDICTION AND APPLICABLE STANDARDS

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). A bankruptcy court's approval of the sale of assets is a final order. *Culp v. Stanziale* (*In re Culp*), 550 B.R. 683, 691 (D. Del. 2015).

A threshold issue in these appeals is Appellants' challenge to the Sale Order's good faith purchaser finding. Appellants argue that the appeals are not statutorily moot because GBRP is not a good faith purchaser entitled to the protections of § 363(m) of the Bankruptcy Code. (*See* D.I. 21 at 23-30.) If the Court agrees, Appellants ask the Court to "reverse" the Sale Order on the basis that it was entered without proper notice, which did not satisfy due process, that it permitted a

12

distribution of sale proceeds that contravenes the priority scheme of the Bankruptcy Code, and that it was entered on an insufficient evidentiary record. (*See* D.I. 21 at 19-23, 31-40; D.I. 26 at 23.) Alternatively, if the Court finds that GBRP is a good faith purchaser, Appellants' appeals are not statutorily moot, they argue, because the relief they seek on appeal—namely an order (i) clawing back previously disbursed administrative expense payments for division *pro rata* among all administrative expense claimants, and (ii) vacating the authorization of the sale of causes of action against the Debtors' D&Os, their professionals, and lenders—would not require unwinding the underlying sale.

"[W]here the good faith of the purchaser is at issue, the district court is required to review the bankruptcy court's finding of good faith before dismissing any subsequent appeal as moot under section 363(m)." *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996). "An analysis of a purchaser's good faith status requires a mixed standard of review." *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 135 (3d Cir. 2017). The Court exercises plenary review of the legal standard applied by bankruptcy court, but reviews its findings of fact on a clearly erroneous standard. *Id.*

## III.    STATUTORY MOOTNESS

### A.    Section 363(m)

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. 363(m). As to the mechanics of the statute, the Third Circuit has recently explained that, "when confronted with a challenge to a § 363(b) sale, the reviewing court must first 'ascertain[ ] that the appeal is from an authorization of a sale, that the purchase was made in good faith, and that

13

the sale was not stayed.'" *In re Boy Scouts of Am.*, 137 F.4th 126, 149 (3d Cir. 2025) (quoting *In re Energy Future Holdings Corp.*, 949 F.3d 806, 821 (3d Cir. 2020)). If those circumstances are met, the court then must determine "whether a remedy can be fashioned that will not affect the validity of the sale." *Id.* (quoting *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998)). "If the remedy does not affect the sale's validity, the court may entertain the appeal. But if it would necessarily affect the sale's validity, the relief is unavailable, so the appeal must be dismissed." *Id.*

As the Third Circuit further has explained, "[i]n restricting appeals for this narrow category of review, Congress chose "to promote the policy of ... finality." (*Id.* at 149 (quoting *Krebs Chrysler-Plymouth*, 141 F.3d at 500). The policy of finality "serves an important role in the bankruptcy process." *Id.* "Debtors often enter bankruptcy in dire financial straits with the value of their assets depreciating rapidly—the proverbial 'melting ice cube.'" *Id.* at 149-50. "Sometimes, in order to avoid a liquidation or risk further dissipation and losses to the estate, it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to ensure that the assets do not lose value." *Id.* at 50 (internal quotations omitted).

## B. The Bankruptcy Court's Good Faith Finding Is Not Clearly Erroneous

As noted, the Sale Order provided that "[t]he Buyer is purchasing the Assets, in accordance with the APA, in good faith, and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all the protections afforded by such provision and otherwise has proceeded in good faith in all respects in connection with the Debtors' chapter 11 cases." (Sale Order at 9.) It further provides that "[t]here was and is no evidence of insider influence or improper conduct in any manner by the Buyer or any of its affiliates in connection with the negotiation, and ultimate execution, of the APA (including the Agency Agreement) with the Debtors." (*Id.* at 10.)

14

In support of their argument that GBRP is not a good faith purchaser entitled to the protections of § 363(m), Appellants assert that: the sale was not an arm's length transaction (*see* D.I. 21 at 25-27); all proponents of the sale had a direct financial stake in the outcome of the Sale Motion (*see id.* at 27-29); GBRP and the Debtors induced vendors to ship goods in the ordinary course based on false representations that they would be able to pay for the goods (*see id.* at 29-30); and the "emergency" justifying the sale was contrived by the Debtors and GBRP (*see id.* at 30-31).

Neither the Bankruptcy Code nor the Bankruptcy Rules defines "good faith." *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). Courts applying 363(m) therefore have turned to "traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Id.* "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings." *Id.* "Typically, the type of misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

## 1. The Record Supports a Finding that the Sale Was an Arm's Length Transaction

Appellants do not contest that the sale was an arm's length transaction between two unaffiliated entities. Rather, Appellants assert that GBRP "gain[ed] intimate knowledge of the Debtors' business" through the Services Agreement before its affiliate, 1903P, entered into the Term Loan with the Debtors. (D.I. 21 at 25-26.) The record demonstrates that the Bankruptcy Court analyzed whether GBRP was an insider in connection with the Services Agreement Motion and held that it "is not an insider of the Debtors." (A00679.) The Bankruptcy Court found that GBRP—which served as a liquidation consultant—had limited influence over the Debtors. The Debtors decided which stores to liquidate, the cadence of pricing, movement of inventory and retention of

15

employees. (10/21/24 Tr. at 116:6-12.) While GBRP provided limited advice on these issues, the ultimate decision-making authority resided with the Debtors. (A00934 at 6-12.) The Bankruptcy Court further found that "GBRP [had] no involvement in the administration of the [Debtors'] estate," which was led by the Debtors' management team and Board of Directors in consultation with their advisors. (*Id.* at 116:23-117:3.) Appellants do not address the Bankruptcy Court's finding that GBRP had no meaningful influence over the Debtors' business. Nothing in the record shows that GBRP exerted any influence over the Debtors beyond the advice they gave in connection with specific store closing sales, or had any information about the Debtors' estate beyond what was necessary to assist in those sales.

The Sale Order reaffirmed this prior finding, concluding that there was no evidence that negotiations with GBRP were not conducted at arm's length. The Court sees no support for Appellants' contention that GBRP controlled the sale process from behind the scenes. When GBRP initially submitted its bid for the Debtors' assets at auction, the Debtors rejected that bid in favor of another, which they deemed superior. Even after Nexus withdrew from the sale, the Debtors did not immediately accept GBRP's renewed offer on the terms GBRP offered; rather the Debtors accepted that offer after exploring all other potential options and negotiating for better terms with GBRP, which they ultimately obtained. Appellants further point to the terms of the Service Agreement, but do not explain how those terms differ from any other than a standard agreement between a retailer and a liquidation consultant. The mere fact that the Debtors have previously conducted business with GBRP cannot transform this sale into a related-party transaction.

Finally, Appellants focus on the connection between GBRP and its affiliate, 1903P, arguing that GBRP *might* be an insider *if* 1903P's knowledge or actions were attributed to GBRP. Appellants claim that the Term Loan gave GBRP various rights; however, GBRP was not a party to that agreement, and the rights that Appellants describe belonged only to the applicable Secured

16

Lenders, including 1903P and others, *not* GBRP. Despite multi-month investigations by both the Committee and Blue Owl into potential improprieties between GBRP and 1903P, there has never even been any allegation that they acted improperly. Appellants point to nothing in the record to show that GBRP engaged in fraud or collusion.

### 2. Financial Stake in the Outcome of the Sale Motion

Appellants argue that "[a]ll proponents of the sale had a direct financial stake in the outcome of the Sale Motion." (D.I. 21 at 27.) That argument does not undermine the good faith finding. As the Debtors point out, anytime a debtor in possession moves to approve a sale of its assets, the debtor, its employees, and various other parties necessarily have a financial stake in that motion. Also, in many such cases, including this one, conversion to chapter 7 would result in significantly lower recoveries for all stakeholders—which is why the Debtors were dutybound to seek approval of this sale to GBRP (and likely why no one moved to convert the chapter 11 cases). Thus, a debtor's financial stake in the sale of its own assets cannot weigh against approval. For the same reason, AlixPartners' supposed financial stake in the sale cannot rebut good faith. In any chapter 11 proceeding where a debtor seeks to pay its debts through a sale of its assets, it will always be in the interest of the debtor's professionals and other creditors to close the sale to ensure that the debtor has sufficient cash to pay its debts. That fact, on its own, cannot support bad faith. Finally, these appeals are not the proper avenue to challenge payments to the Debtors' professionals. Appellants have the right to object to such fee applications in the bankruptcy proceeding itself.

### 3. The Record Does Not Show that the Debtors Made False Representations to Vendors

Appellants assert that the Debtors "represented to the Court and to thousands of vendors that" they would use the ABL and Term Loan "to pay for post-petition goods" when, "behind the scenes," the Debtors intended for Nexus to pay its creditors. (D.I. 21 at 29.) The Debtors point out

17

that any such statements were true, as the Debtors did have access to post-petition financing and did use such facilities to pay expenses. At the outset of their chapter 11 cases, the Debtors had a stalking horse agreement with Nexus, who agreed to pay the Debtors' postpetition accounts payable—*i.e.* the administrative expense claims. The publicly filed Nexus APA provided that Nexus would be responsible for administrative expense claims if it was the successful bidder. Until the Nexus deal closed, the Debtors would fund their business using its postpetition loans, which Nexus would be obligated also to repay. (A00217 (defining "Repaid Indebtedness" that Nexus would repay).) As a result, at all relevant times, the Debtors fully expected the sale to Nexus to close, for Nexus to repay the Secured Lenders in full, and for Nexus to pay all administrative expense claims in full. While that sale ultimately fell through, Appellants do not argue that the Debtors made any such statements *after* Nexus informed them that the sale would not close.

Appellants further assert that "by the second week of October 2024, [the Debtors] knew they were not obtaining inventory sufficient to meet the minimum asset covenant necessary to close [the Nexus] sale." (D.I. 21 at 29.) Assuming that is true, it does not show that the Debtors made knowingly false statements. The record reflects that Nexus represented to the Debtors that the sale might still close regardless of whether the Debtors met this condition. (12/31/24 Tr. at 14:9-22.) When Nexus told the Debtors that the sale would not close, the Debtors stopped placing purchase orders with vendors and shifted to liquidating their assets. (12/19/24 Tr. at 25:8-18.)

### 4. Neither the Timing of the Sale, Nor the Debtors' Failure to Pay All Administrative Expense Claims in Full with Sale Proceeds, Demonstrates Clear Error in the Good Faith Finding

Appellants assert that Debtors and GBRP "contrived and orchestrated" the emergency Sale Hearing. (D.I. 21 at 30.) Appellants suggest that the Debtors could have sought approval of their sale to GBRP earlier because "GBRP continued negotiating the terms of a potential purchase agreement" after the Nexus auction and because "the Debtors . . . knew or should have known by

18

the second week of October that the Nexus sale was in doubt." (*Id.*) Rather, the record supports that Nexus did not inform the Debtors that the sale would not close until December 14, 2024. (A1589, Perry Decl. ¶ 15.) Negotiations with GBRP did not resume until the following day, when GBRP reached out to the Debtors to renew the offer that had previously been rejected at auction. (*Id.* ¶ 16.) Over the ensuing 12 days, the Debtors and their advisors negotiated an APA with GBRP while, in parallel, exploring alternative transactions, none of which resulted in an offer for the Debtors' assets. (12/31/24 Tr. at 15:25-16:12.) As these negotiations progressed, at the December 19, 2024 hearing, the Bankruptcy Court expressed the view that the Debtors' estates were "a melting ice cube" and told the Debtors to "move expeditiously." (12/19/24 Tr. 44:4-11.) Following this guidance, once the Debtors and GBRP reached an agreement, and it became clear that no other purchasers would come forward, the Debtors filed their Sale Motion on December 27, immediately after a deal was reached and the purchase agreement was signed. In short, Appellants point to nothing in the record supporting their claim that the timing of the sale motion was intentional.

Appellants further assert that GBRP had the means to force the Debtors to expedite the sale process: "GBRP, as lender, might cut off Debtors' use of cash collateral if the GBRP sale did not close the week of December 30." (D.I. 21 at 31.) But GBRP was not the Debtors' lender and thus had no control over the Debtors' cash collateral. While the record reflects that the Debtors' Secured Lenders, which did include one GBRP affiliate, 1903P, were not interested in continuing to fund the Debtors' operation without a concrete plan for the Debtors to repay the loans, that is hardly evidence of bad faith. Secured Lenders with no relationship to GBRP, like PNC, were equally adamant that the Debtors propose a path forward as quickly as possible. (12/19/24 Tr. at 40:24-41:9.5.)

Finally, Appellants argue that GBRP "use[d] cash proceeds from the post-closing sale of inventory provided by the [Appellants] . . . to fund the Wind Down Budget, Administrative Budget, stub rent, professional fees and more." (D.I. 21 at 31.) The record reflects that, upon closing, the

19

APA obligated GBRP to pay off the Debtors' Secured Lenders in full—a prerequisite for administrative expense claimholders like Appellants receiving any recovery—and to begin funding the Debtors' operating expenses in full. (A01918–19 § 4.02(a)-(d).) GBRP agreed to fund the Debtors' expenses in full even if those expenses exceeded the proceeds from the sale of the Debtors' inventory and other assets. (A01919 § 4.02(e).) These guaranteed payments to which GBRP agreed totaled in the hundreds of millions of dollars. (A01916–17 § 3.01.) In consideration for these payments, the Debtors transferred to GBRP substantially all of the Debtors' assets, including inventory. (A01906–10 § 2.01.) As the Bankruptcy Court found, the sale maximizes the funds that Debtors have available to pay administrative claimholders, like Appellants. (12/31/24 Tr. at 25:8-14.) The very fact that Appellants might receive less-than-full recoveries obligated the Debtors, as fiduciaries, to pursue the Sale and obtain the highest possible recovery for creditors like Appellants. That the Debtors had not fully paid each and every creditor who sold the assets that GBRP ultimately acquired does not demonstrate clear error in the good faith finding, which otherwise finds support in the record.

### C.      The Remedies Sought By Appellants Will Affect the Validity of the Sale

The Debtors urge the Court to dismiss the appeals as statutorily moot pursuant to section 363(m). Appellants argue that the statute does not moot their appeals where, as here, the Court need not unwind the underlying sale in order to provide Appellants the relief they seek. (D.I. 21 at 1; D.I. 26 at 20-21.)

Having ascertained that these appeals are from an authorization of a sale, that the purchase was made in good faith, and that the sale was not stayed, the Court then must determine "whether a remedy can be fashioned that will not affect the validity of the sale." *In re Boy Scouts of Am.*, 137 F.4th at 149. "That determination requires close scrutiny," the Third Circuit has advised. *Id.* "If the remedy does not affect the sale's validity, the court may entertain the appeal. But if it would

necessarily affect the sale's validity, the relief is unavailable, so the appeal must be dismissed." *Id.* "The answer is easy," the Third Circuit has explained, "where the requested relief 'would materially increase or decrease the purchase price,' but other remedies, too, may fall into that category with 'careful study[,] depending on the nature of the claim and the type of relief sought.'" *Id.* (quoting *Krebs Chrysler-Plymouth*, 141 F.3d at 498-99).

In assessing whether a challenge affects the validity of a sale, the Court "must look to the remedies requested by the appellants." *Krebs Chrysler-Plymouth*, 141 F.3d at 499 (citation omitted). Appellants' requests for relief on appeal include: (1) ordering previously disbursed administrative claim payments to be clawed back and divided *pro rata* among all administrative claimants, and (2) vacating the authorization of the sale of causes of action against the Debtors' directors and officers, their professionals, and their lenders so those claims can be investigated and pursued for the benefit of the estates. (*See* D.I. 21 at 40.) The Court concludes that both forms of relief will affect the sale's validity.

With respect to the first, Appellants argue that, while uncommon, "bankruptcy courts do have the power to claw back payments made during the pendency of a case." (D.I. 26 at 21 (quoting *In re LTV Steel Co., Inc.*, 288 B.R. 775, 778-79 (Bankr. N.D. Ohio 2002) (noting entities receiving interim payments could be required to disgorge funds so that all administrative claims share pro-rata)).)

At this point, hundreds of leases have been assumed and assigned for GBRP's benefit through a series of 27 post-closing designation notices. (*See, e.g.*, A03311–16; A03317–53.) Variety has begun operating a new entity using the Big Lots brand name. Proceeds from the sale and subsequent transactions have largely been disbursed to administrative claimholders, including the Appellants. This includes payments to cover a $125 million wind-down budget, which were used to pay employee severance, permitting fees, and taxes, among other things as well an almost

21

$50 million administration budget that covered payroll, insurance, and other expenses. (A02623; A02625.) It also includes distributions of estate assets to well over 1,000 claimholders. (*See* A03354–425.) Such large-scale claw backs would be administratively impractical.

Moreover, ordering the Debtors to claw back and redistribute tens of millions of dollars made to hundreds of creditors, who performed services after the sale for GBRP's benefit, would undoubtedly affect the bargain struck by the parties, and redistribute payments. This would include clawing back and redistributing payments from landlords for stores that GBRP's assignee, Variety, continues to operate or from employees who continue to work at those stores, which would be destructive to the business GBRP acquired. Where, as here, an appeal challenges the distribution of sale proceeds, it is moot to the extent redistributing the sale proceeds "would affect the bargain that the Debtor struck in agreeing to the Sale" and produce a different transaction to which the parties may not have agreed. *City of Jersey City v. Jersey City Cmty. Hous. Corp. (In re Jersey City Cmty. Hous. Corp.)*, 2023 WL 3250267, at *7 (D.N.J. May 4, 2023), *aff'd on other grounds* 2024 WL 1254833 (3d Cir. Mar. 25, 2024). This alternative payment scheme would have impacted the price GBRP was willing to pay for these assets, assuming GBRP was willing at all to purchase a business that was barred by court order from paying its go-forward expenses.

Second, Appellants request that the Court unwind the sale insofar as it transferred certain litigation claims to GBRP, so that those claims can be investigated and pursued for the benefit of creditors. "The record is clear that the Debtors provided no valuation of the assets. That includes no valuation of estate claims against insiders, causes of action against parties like Nexus, or postpetition inventory delivered by vendors—which the Debtors themselves admitted had 'significant value.'" (*See* D.I. 26 at 15 (citing 12/31/24 Tr. at 112:22–113:1).)

Appellants are mistaken as to what claims were assigned to GBRP as part of the sale. Appellants fault the Debtors for not valuing "potential claims against directors and officers." (D.I.

22

21 at 37.) But the record reflects that such claims were not sold to GBRP and remain with the Debtors' estate. (12/31/24 Tr. at 149:20-23.) Appellants also claim that the Debtors' did not sufficiently justify the sale of claims against Nexus (D.I. 21 at 31) and the Secured Lenders (*id.* at 37.) But claims against Nexus were released by the Court-approved Stalking Horse Agreement (A00288–89), while claims against the Secured Lenders were released when no one brought a claim within the Challenge Period (A00749–50.) There has been no appeal from the orders releasing these claims. But to the extent Appellants seek reversal of the sale of the remaining litigation claims to GBRP, they challenge the validity of the sale, and the appeal is plainly moot. The "narrow exception" for appeals of sale orders only applies where the appeal is "so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied." *In re Pursuit Cap. Mgmt.*, 874 F.3d at 139 (citations and internal quotation marks omitted).

Finally, upon consideration of "whether a remedy can be fashioned that will not affect the validity of the sale," *In re Boy Scouts of Am.*, 137 F.4th at 149, the Court is unable to divine another method which would afford Appellants the relief they seek.

## V.    CONCLUSION

For the reasons set forth herein, the appeals must be dismissed pursuant to section 363(m) of the Bankruptcy Code. An appropriate Order will be entered.